## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF THE STATE OF NEW YORK

--------------------------------------------------------- X

CHRISTOPHER CLIFFORD,

Plaintiff,

-versus-                                       Civil Action No._____

MAJOR LEAGUE BASEBALL; MLB
ADVANCED MEDIA, LP; HOUSTON
ASTROS, LLC; BOSTON RED SOX
BASEBALL CLUB, LP; and JOHN DOES 1-
50,

Defendants.

--------------------------------------------------------- X


## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................ 1

II.     PARTIES .................................................................................................... 7

III.    JURSIDICTION AND VENUE ................................................................. 9

IV.     FACTUAL BACKGROUND ..................................................................... 9

V.      EFFECTS OF THE SCHEME AND DAMAGES TO THE PLAINTIFF AND THE

        CLASS ..................................................................................................... 23

VI.     CLASS ACTION ALLEGATIONS ......................................................... 24

VII.    CONCEALMENT TOLLED THE STATUTE OF LIMITATIONS ............... 28

VIII.   CLAIMS FOR RELIEF ........................................................................... 29

IX.     DEMAND FOR RELIEF ......................................................................... 56

X.      JURY DEMAND ..................................................................................... 57

i

Plaintiff Christopher Clifford brings this class action, on behalf of himself and all others similarly situated, against MAJOR LEAGUE BASEBALL; MLB ADVANCED MEDIA, LP; HOUSTON ASTROS, LLC; BOSTON RED SOX BASEBALL CLUB, LP; and JOHN DOES 1-50, based on personal knowledge as to itself and upon information and belief as to all other allegations, and alleges as follows:

## I.      INTRODUCTION

1.      In November 2019, online sports publication *The Athletic* published a bombshell story reported by Ken Rosenthal and Evan Drellich describing an elaborate and sophisticated scheme by Major League Baseball's ("MLB's") Houston Astros in 2017 to use advanced technology to electronically surveil their opponents in order to steal their signs and relay them to Astros players on the field, in contravention of MLB's Official Rules defining the parameters of on-field conduct. The Astros won the 2017 World Series.

2.      In the weeks and months after the public revelation of the Astros' sign stealing, the story broadened. In January 2020, *The Athletic* published new allegations that MLB's Boston Red Sox had utilized their own sign-stealing scheme during the 2018 MLB season. Information from sources within the Red Sox organization substantiated these claims. The Red Sox won the 2018 World Series.

3.      In January 2020, MLB released its own report on the results of its investigation into the Astros' cheating. The report implicated the Astros in the alleged misconduct and revealed a number of behaviors reinforcing the Astros' culpability in the sign-stealing scheme.

4.      The public outrage resulting from this scandal provoked MLB to hand down swift punishments. The Astros, for example, were fined $5 million and forfeited valuable picks in the

1

2020 and 2021 drafts. Red Sox manager Alex Cora and Mets manager Carlos Beltrán—key players in the scandals—lost their jobs overnight. The Astros front office cleaned house, firing their general manager Jeff Luhnow and field manager A.J. Hinch. The sanctions were the most severe that MLB has ever issued against a member club and are among the most severe sanctions for in-game misconduct in baseball history.

5.      On the surface, justice had been served. The bad actors had been disciplined, and MLB renewed its purported commitment to its fans' confidence in the integrity of the games and player performances. But the truth is more sordid than that. For years, MLB had been ignoring the fraudulent conduct of its constituent teams and players, and failing to adequately investigate, deter, prevent, remedy, or disclose this behavior. Why? The intentional manipulation of players' statistical performance would have had a disastrous effect on a cash cow called daily fantasy sports ("DFS"), which MLB was deeply invested in.

6.      In fantasy sports, participants assemble virtual teams of real professional sports players which "compete" based on the statistical performance of the assembled players in actual games. Participants pay fees to create fantasy teams and compete (tantamount to placing bets) and receive prizes if their teams win. These fantasy leagues (usually played online) have grown wildly popular and now are part of a multi-million-dollar (and, by some estimates, a multi-billion-dollar) industry.

7.      Despite its traditional anti-gambling posture, MLB decided it wanted a piece of the fantasy wagering pie. In 2013, MLB—through an affiliated entity, Defendant MLB Advanced Media L.P. ("MLBAM")—quietly invested in DraftKings Inc. ("DraftKings"), a daily fantasy sports operator.  Two years later, in 2015, MLB added to its original confidential

investment a more substantial, public equity investment in DraftKings. MLB justified the

expenditure as a means "to reap meaningful benefit from the rise of daily fantasy."[1] Indeed, this

investment was part of a concerted strategy by MLB to collect what it viewed as its fair share of

the fees that fantasy baseball contestants paid to their league operators, while using fantasy

leagues to generate an increased interest in baseball.  MLB believed that by endorsing fantasy

leagues, it could increase attendance, advertising and broadcasting revenues, and sales of official

MLB merchandise to fans.

8.      After making a substantial public investment in the fantasy sports arena in 2015,

MLB positioned itself as a "partner" to DraftKings, rather than as a mere passive investor.[2]  In

addition to entering into a comprehensive league partnership agreement with DraftKings,[3] MLB

began an aggressive advertisement campaign to promote DraftKings' fantasy baseball contests

across its various media properties.  MLB granted DraftKings broad promotional and advertising

rights, including access to MLB affiliated logos, while making DraftKings the "Official Daily

Fantasy Game" of Major League Baseball. MLB also granted DraftKings the exclusive right to

make sponsorship agreements with individual MLB member teams.[4]

---

[1] Eric Fisher, *A look into DraftKings' MLB Deal*, SPORTS BUSINESS JOURNAL (Apr. 20, 2015), https://www.sportsbusinessdaily.com/Journal/Issues/2015/04/20/Media/DraftKings-MLB.aspx (accessed Feb. 4, 2020).

[2] Press Release, *DraftKings Becomes the Official Daily Fantasy Game of Major League Baseball*, BUSINESSWIRE (Apr. 2, 2015), https://www.businesswire.com/news/home/20150402006154/en/DraftKings-Official-Daily-Fantasy-Game-Major-League (accessed Feb. 4, 2020).

[3] *Id.*

[4] *See* Dustin Gouker, Play Ball: DraftKings Announces Deals with 27 Major League Baseball Teams, LEGAL SPORTS REPORT (July 31, 2015), https://www.legalsportsreport.com/2827/draftkings-mlb-team-deals/ (accessed

9.      The DraftKings partnership proved so valuable that in 2019 MLB struck a deal with another major player in DFS, FanDuel.

10.     Defendant MLB is an unincorporated entity comprised of 30 major league teams. Pursuant to MLB's 2015 partnership agreement with DraftKings, each of these individual teams entered into lucrative promotional agreements with DraftKings. These agreements have facilitated co-branding opportunities between individual teams and the fantasy sports operator DraftKings.  Shortly after MLB signed the 2015 agreement, DraftKings advertisements appeared in 27 of 30 major league ballparks, and individual teams began co-branding promotions with DraftKings.

11.     In particular, as it relates to this lawsuit, two of MLB's teams, the Houston Astros LLC (the "Houston Astros" or the "Astros") and the Boston Red Sox LP (the "Boston Red Sox" or the "Red Sox"), entered into agreements with DraftKings and have continued to promote DraftKings' fantasy baseball competitions to their fanbases throughout the period relevant to the claims against them in this lawsuit. By partnering with DraftKings, MLB and its constituent teams, including the Astros and the Red Sox, have been complicit in persuading fans to participate in DraftKings' baseball wagering competitions.

12.     MLB has long held itself out to the public as an advocate for the enforcement of its Official Rules and other regulations, specifically as it relates to conduct that threatens the

---

Feb. 4, 2020) ("DraftKings' existing partnership with Major League Baseball included a provision that it is the only DFS site that can sign deals with individual teams.").

honesty and integrity of the game. MLB's Official Rules and other regulations, as they relate to the period at issue in the foregoing lawsuit, expressly prohibit the use of any electronic devices to decode or attempt to decode signs between pitcher and catcher.

13.     By embracing the DraftKings slogan—that "life is more fun with skin in the game"—MLB has popularized fantasy games and encouraged fans to take a financial stake in them.  MLB fans pay DraftKings millions of dollars in daily fantasy sports baseball contest fees with the expectation that the game is honest. DraftKings, MLB and MLB's affiliate teams derive enormous financial benefit from fan's participation in these fantasy games.

14.     But fans who engaged in fantasy wagering at the encouragement of MLB were not privy to the fact that MLB had, in many ways, abandoned its commitment to preserving the honesty and integrity of the game of baseball—and to enforcing its own Official Rules—at the time of its partnership with DraftKings. Notably, wagering fans and the public at large were unaware that MLB had failed to enforce its rules prohibiting (among other things) electronic sign-stealing, and that such misconduct—which MLB was aware of but chose not to disclose—changed the outcome of DraftKings' MLB DFS wagering contests, not to mention game outcomes, given the link between sign-stealing and player statistics.

15.     Not only did MLB's lack of accountability substantially undermine the fairness of MLB inter-team competition, it also compromised fantasy baseball contests.  MLB and its teams actively induced fans to enter into fantasy baseball wagers, the outcomes of which are determined solely by the real-life, statistical performances of MLB's players.  While luring fans to participate in these fantasy games, MLB member teams were engaging in secret corrupt and fraudulent conduct, in obvious violation of MLB Official Rules and other regulations.  This misconduct

5

distorted player's statistics, impacted the outcomes of MLB games, and changed the outcomes of fantasy baseball competitions.

16.     The manipulative and deceitful conduct of at least two of MLB's teams—the Houston Astros and the Boston Red Sox—and their employees has been exposed and has, at the very least, impacted all fantasy baseball contests that took place from early in 2017 through the end of the 2018 regular season and into the 2019 season.

17.     MLB's own report on the results of its investigation into the Astros' cheating contain numerous instances confirming these allegations. For example, "At the beginning of the 2017 season, employees in the Astros' video replay review room began using the live game feed from the center field camera to attempt to decode and transmit opposing teams' sign sequences."[5]

18.     From the beginning of 2013 through the end of the 2019 season, MLB was cognizant of the fact that its affiliated teams were engaging in deceitful and corrupt behavior that was ultimately distorting player performance statistics and undermining fantasy baseball contests.  MLB ignored the fraudulent conduct of its constituent teams, and failed to adequately investigate, deter, prevent, remedy and/or disclose said behavior. Instead, MLB condoned fan participation in these fantasy baseball games, despite its knowledge that outcomes were deliberately being corrupted and manipulated.

19.     Plaintiff Christopher Clifford, along with the millions of other similarly situated fans who participated in fantasy baseball competitions, have been victimized by MLB and its

---

[5] Statement of Robert D. Manfred, Jr., Commissioner of Baseball, dated Jan. 13, 2020.

constituent teams' deceitful conduct.  Upon the belief that players' statistics were derived honestly (and from play within the parameters set by MLB Official rules and other regulations), Plaintiff and other contestants placed wagers on fantasy baseball contests. In reality, and unbeknownst to Plaintiff and other participants, the outcomes of the fantasy contests were counterfeit, affected by MLB teams' cheating, which MLB concealed and/or willfully ignored.  Plaintiff (along with other contestants) would have refused to participate in these fantasy baseball contests had they been aware of the intentional manipulation of players' statistical performance, which MLB chose to ignore and not disclose.

20.    As a consequence, Plaintiff and other members of the Class have sustained losses and damages that are the subject of this action, and is seeking on behalf of himself and all other daily fantasy sports participants, to recover the amounts of fees and wagers in these tainted fantasy baseball contests.  In addition, Plaintiff seeks statutory and punitive damages, equitable relief, attorney's fees and costs, interest and all other relief that is warranted by applicable law.

## II.    PARTIES

### A.    Plaintiff

21.    Plaintiff Christopher Clifford is a citizen of the United States and during the class period was and still is a resident of the State of Florida.

### B.    Defendants

22.    Defendant MAJOR LEAGUE BASEBALL ("MLB") is an unincorporated association whose members are the thirty Major League Baseball Clubs. MLB, on behalf of its

members, and acting through its Office of the Commissioner, has responsibility for
administrative and operational matters relating to Major League Baseball. MLB's headquarters
are located at 1271 Avenue of the Americas, New York, New York.

23.     Defendant MLB Advanced Media, L.P. ("MLBAM") is a limited partnership
comprised of the owners of MLB's member teams and has its principal place of business at 1271
Avenue of the Americas, New York, New York. Defendant MLBAM has responsibility for
internet and interactive marketing for MLB, including MLB's relationship with DFS providers
and promotion of fantasy baseball competitions.

24.     Defendants MLB and MLBAM are collectively referred to in this Complaint as
"MLB" or "the MLB Defendants."

25.     Defendant Houston Astros, LLC (the "Houston Astros" or the "Astros") is a
Texas limited liability corporation that owns and operates the Houston Astros professional major
league baseball team and is a constituent member of MLB. At all times relevant to the events at
issue in this lawsuit, defendant Houston Astros, LLC engaged in continuing substantial business
in this District, individually and as a member of defendant MLB.

26.     Defendant Boston Red Sox Baseball Club LP (the "Boston Red Sox" or the "Red
Sox") is a Massachusetts limited partnership that owns and operates the Boston Red Sox
professional major league baseball team and is a constituent member of MLB. At all times
relevant to the events at issue in this lawsuit, defendant Boston Red Sox Baseball Club LP
engaged in continuing substantial business in this District, individually and as a member of
defendant MLB.

8

27.     The true identities of Defendants John Does 1–50 are not presently known to

Plaintiffs. On information and belief, Defendants John Does 1-50 are MLB teams that engaged in

sign-stealing but have not yet been identified, as well as individual current and former players,

coaches, trainers, and other employees of the Astros and/or Red Sox actively involved in the

schemes alleged in this Complaint.

### III.     JURSIDICTION AND VENUE

28.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331(d) as this

Complaint is a civil action filed under Rule 23 of the Federal Rules of Civil Procedure or similar

State statute and this Court has original jurisdiction of any civil action in which the matter in

controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and there are

more than 100 putative class members as defined hereto, and with diversity.

29.     Venue is appropriate within this Court and in this District under 28 U.S.C.

§1391(b) (general venue provision).  Defendants all transacted business within this District, and

Defendants transacted their affairs and carried out interstate trade and commerce in this District.

Further, Defendants may be found in this District and have their headquarters located within this

District.

### IV.     FACTUAL BACKGROUND

30.     Fantasy baseball is a statistics-based game, in which participants "manage" rosters

of selected Major League Baseball players against the competing "lineups" of players chosen by

other contestants. How the chosen players perform in real life is determinative of an individual

contestant's success once he or she sets up a "lineup" of players.  Objective statistical metrics

9

(e.g., home runs, hits, batting averages, strike outs, earned run averages) are used to assign a designated number of points to each player on a fantasy baseball team.  The contestant whose fantasy team accumulates the most points for the duration of the contest earns money based on those wagers.

31.    Fantasy baseball and other fantasy sports competitions are designated as "games of skill" and as such are exempted from federal prohibitions against illegal gambling. In 43 states and the District of Columbia, wagering in the context of fantasy competitions, is permitted by state law.

32.    DraftKings Inc., founded in 2012, is a Delaware corporation with a primary place of business of Boston, MA.  DraftKings uses its website and mobile applications to operate both daily and weekly fantasy sports contests, across all major sports, including baseball. Unlike the majority of fantasy sports operators' contests that span entire seasons, DraftKings offers a unique experience for contestants to compete over the course of a much shorter intervals (i.e., a single day or week).

33.    DraftKings offers daily fantasy sports ("DFS") baseball competitions ("MLB DFS"), requiring participants to set their lineups within the parameters of a "salary cap," which is an assigned, arbitrarily derived value. Requisite to competing, contestants must select players who have a cumulative salary under the ceiling set by this salary limit.  When deciding on the players to select for their respective teams, contestants consult past statistical performances of the real-life MLB players. Thus, a player's personal statistics play a vital role in the contestant's decision-making process, when it comes to "drafting" players, allocating salary, and setting lineups.

34.   A DraftKings MLB fantasy contest begins when the first real-life MLB game, on which the fantasy contest is based, commences.  For example, for a daily fantasy contest, the contest begins when the first MLB game of the day begins.  The cumulative number of points attained by a contestant's lineup of real-life players determines his ranking in the contest.  Points scored by contestants are wholly contingent upon real-life player performance.  Thus, any pecuniary benefit by a contestant is inextricably linked to statistical metrics, designed to measure MLB players' actual performance.

35.   Daily and weekly fantasy competitions can be limited to "head to head" contests, featuring two competing contestants, or consist of tournament play, which may include competition among many contestants' lineups.  Upon joining a competition, each contestant pays a fee, a portion of which is kept by DraftKings as payment for its DFS service, while another portion is allocated as prize money for the competition.

36.   DFS contests have become increasingly popular among baseball fans.  In 2014, DraftKings' reported receiving $300 million in DFS entry fees, some $30 million in revenues,[6] and an eight-fold increase in contest participation. This evidences the enormous popularity of these fantasy contests.[7]

---

[6] *See* Darren Heitner, *DraftKings Reports $304 Million of Entry Fees in 2014*, FORBES (Jan. 22, 2015), https://www.forbes.com/sites/darrenheitner/2015/01/22/draftkings-reports-304-million-of-entry-fees-in-2014 /(accessed Jan. 22, 2020) ("Daily fantasy sports operator DraftKings has released its key annual fiscal year 2013 and 2014 financials for the first time, which shows entry fees of $45 million in 2013 and a rise to $304 million in 2014. Revenues were $4 million and $30 million, respectively.").

[7] Albert Chen, Billion Dollar Fantasy: The High-Stakes Game Between FanDuel and DraftKings That Upended Sports in America, 174 (2019).

37.    MLB's 2013 investment in DraftKings, made through Defendant MLBAM, was kept confidential at the behest of MLB.[8]  Despite the fact that the exact amount of MLB's investment was not disclosed, DraftKings employees were reportedly "taken aback by the size of it."[9]

38.    MLB publicly announced an additional investment in DraftKings in April 2015, which was touted by MLB executives as "sizable enough to reap meaningful benefit from the rise of daily fantasy.[10] Concurrent with this investment, MLB announced it had entered into the most comprehensive league partnership in daily fantasy sports history."[11] Pursuant to the agreement, DraftKings was granted the right to offer in-ballpark baseball experiences tailored to a particular team's market; it also attained promotional rights, use of MLB logos, and exclusive rights to sign sponsorship deals with individual MLB member clubs.  Furthermore, DraftKings was granted the title of "Official Daily Fantasy Game" of MLB.[12]

39.    After MLB's second investment in DraftKings, an aggressive marketing campaign ensued, from which MLB, its member teams, and DraftKings all derived tremendous financial benefit. DraftKings announced individual partnerships with 27 of the 30 teams that comprise

---

[8] *Id.* ("[DraftKings'] 2013 marketing partnership with MLB was a watershed moment because it was the first daily fantasy partnership with a professional sports league, but it also was a ghost deal—at MLB's behest, there was no press release at the time, simply DraftKings signage popping up in major league ballparks and DraftKings banners on MLB.com.").

[9] *Id.* ("[S]ome early employees who knew the details of the deal were taken aback by the size of it, but what it did accomplish was to give the industry legitimacy and also give DraftKings an inside track to a bigger deal, which was announced in the spring of 2015.").

[10]  *See* Fisher*, supra,* at note 1.

[11]  *See* Business Wire, *supra,* at note 2.

[12] *See* Fisher, *supra*, at note 1.

12

MLB.[13] As a result of these partnerships, DraftKings was able to create unique market-specific experiences, while gaining the right to advertise inside the individual team's stadiums.

40.     The explosion of fantasy sports into mainstream sports culture drew the attention of regulators in several states.  In 2015-16, New York State Attorney General Eric Schneiderman was among the most outspoken against DraftKings' and FanDuel's growing popularity, as he sought to designate DFS games as illegal gambling by preliminary injunction.  Though temporarily prohibited from operating in New York State, the New York State Assembly deemed fantasy sports "games of skill" and ultimately passed legislation legalizing fantasy games. Similar battles were fought in many other states, with the outcome being legalization of fantasy sports contests in 43 states as well as the District of Columbia.

41.     As a result of the aggressive marketing campaign that was borne out of MLB/DraftKings partnership, MLB DFS fantasy baseball contests have generated hundreds of millions of dollars in fees paid to DraftKings, as well as tens of millions of dollars in revenues. MLB and its teams, specifically the Astros and the Red Sox, have been direct financial beneficiaries of these windfalls.

42.     Defendant MLB, through the conduit of its Commissioners office, is responsible for the operation of the professional sports entity known as Major League Baseball.  The Astros and the Red Sox are two of the thirty constituent teams of MLB.

---

[13] *See* Gouker, *supra,* at note 4.

43.     MLB's thirty team constituency collectively own Defendant MLBAM, which provides internet and marketing services for MLB and its teams, while providing oversight and participating in the promotion of the MLB/DraftKings partnership.

44.     Defendant MLB has been governed by a written set of rules since the National League (MLB's predecessor, along with the American League) began play in 1876. In 1949, the set of rules was codified as MLB's Official Rules, which clearly defined the parameters of on-field conduct. MLB has had a long-standing policy of enforcing its rules through the issuance of league-wide memoranda.

45.     MLB has held itself out to the public-at-large, and to the subset of the public comprising fantasy sports players, as an advocate for the enforcement of its Official Rules and other regulations, specifically as it relates to conduct that threatens the honesty and integrity of the game.

46.     For example, MLB has instituted Player Policies, and represents that it expects all players to be responsible for knowing and adhering to the requirements and expectations of these policies. Among these policies are a February 2019 memo on sports betting, which expressly prohibits all baseball personnel from participating in or otherwise benefitting financially from any baseball-related fantasy game, as well as prohibiting club personnel and MLB personnel from holding any direct or indirect ownership interest in a fantasy baseball company.

47.     MLB's Official Rules and other regulations, as they relate to the period at issue in the foregoing lawsuit, expressly prohibit the use of any electronic devices to decode or attempt to decode the discreet communications between a catcher and a pitcher, commonly referred to as "signs." Through a series of hand movements and placements, a catcher typically communicates

the desired type of pitch and its desired location to his team's pitcher.  A pitcher's ability to effectively conceal information about his forthcoming pitch is crucial to his success.  The ability to "steal" an opponent's signs gives a player a discernable advantage, and doing so by electronic means, is not only regarded as unethical, but is a clear violation of MLB's Official Rules.

48.     MLB and its teams were (and are) responsible for abiding by MLB's Official Rules and other regulations and are aware that illegally using electronic sign-stealing methods would have a negative impact on the game's public perception.  The unethical behavior of implementing an electronic means to steal signs threatens the honesty and fairness of MLB competition.  As any major league hitter can attest to, a team that can preemptively convey to its batter the type, speed and location of a pitch the opposing team's pitcher intends to throw has a clear advantage.  Tellingly, one major league player has stated, "I would rather face a player that was taking steroids than face a player that knew every pitch that was coming."[14]

49.     MLB's adoption of an instant replay challenge process in 2014 to dispute certain on-the-field decisions had an unintended negative consequence.  It effectively allowed teams to create rooms ("review rooms") staffed with team personnel whose sole purpose was to review video footage of plays to determine whether it was worthwhile to challenge an on-the-field ruling.  With such powerful technological resources now at teams' fingertips, gaining a competitive advantage though means expressly prohibited by MLB's rules (including electronic sign-stealing) became exceedingly easy.

---

[14] Alex Wood (@Awood45), TWITTER (Jan. 16, 2020, 1:37 PM),
https://twitter.com/Awood45/status/1217923855156760577 (accessed Feb. 4, 2020).

50.     With the implementation of instant replay, MLB teams, including the Astros and
Red Sox and their personnel, became aware of the opportunity to easily "steal" the opposing
team's pitcher and catcher signals, and created schemes to effectively relay the information from
the replay room to the dugout and to teammates that were batting.  In 2017, there were numerous
complaints issued to MLB Commissioner's Office by MLB teams who suspected that other clubs
were illegally using electronic means to circumvent MLB rules.[15]

51.     Because of the indisputable link between sign-stealing and the manipulation of
player statistics, MLB's failure to enforce its own rules prohibiting such disreputable conduct had
definite ramifications on the outcome of DFS wagering contests.  By illegally impacting MLB
player statistics, the electronic sign-stealing schemes employed by various MLB teams corrupted
the fantasy baseball player selection process, which was critical to the determination of the
contests' eventual winners.

52.     Although MLB was acutely aware that its member teams were violating rules
prohibiting electronic sign-stealing from 2017 to 2019, MLB did not take reasonable steps to
curb this behavior. MLB knew of the likely impact of such violations on player performance, but
failed to investigate, deter, prevent, remedy, or disclose the existence of this team and player
misconduct to the wagering public. As a result, until November 2019, the public was unaware

---

[15] *See* Ken Rosenthal & Evan Drellich, *The Astros stole signs electronically in 2017 — part of a much broader
issue for Major League Baseball*, THE ATHLETIC (Nov. 12, 2019), https://theathletic.com/1363451/2019/11/12/the-
astros- stole-signs-electronically-in-2017-part-of-a-much-broader-issue-for-major-league-baseball/ (accessed Jan.
22, 2020) ("'Beginning in the 2017 season, numerous Clubs expressed general concerns that other Clubs were
stealing their signs,' MLB said in a statement.").

that the Astros and Red Sox had engaged in persistent and continuous violations of MLB Official Rules with regard to sign-stealing from early 2017 to 2019.

53.     On November 12, 2019, Ken Rosenthal and Evan Drellich of the *The Athletic,* a subscription-based sports website, exposed the sign-stealing scheme being used by the Houston Astros during the 2017 baseball season.  Per the report, "early in the 2017 season, at least two uniformed Astros got together to start the process" of creating an electronic sign-stealing system, a clear violation MLB Rules and regulations.[16]  Shortly after this report, MLB identified the two Astros involved as then-player Carlos Beltrán and then-bench coach Alex Cora.

54.     As the alleged architects of the sign-stealing scheme, Beltrán and Cora, in conjunction with Astros baseball operations personnel, utilized a "[video] feed from a camera in center field, fixed on the opposing catcher's signs and hooked up to a television monitor that was placed on the wall steps from the team's home dugout at Minute Maid Park."[17]  During real-time play, an individual watching the video feed would decipher the opponent's signs and then relay the information to the batter by "bang[ing] a nearby trash can with a bat."[18]  This scheme is hereinafter referred to as the "Trash Can Scheme."

---

[16] *Id.*

[17] *Id.*

[18] *Id.  See also* Rob Manfred, *Statement of the Commissioner*, MAJOR LEAGUE BASEBALL (Jan. 13, 2020), at 2, https://img.mlbstatic.com/mlb-images/image/upload/mlb/cglrhmlrwwbkacty27l7.pdf (accessed Feb. 4, 2020). ("witnesses explained that they initially experimented with communicating sign information by clapping, whistling, or yelling, but that they eventually determined that banging a trash can was the preferred method of communication".)

55.     The Trash Can Scheme employed by the Astros and exposed by *The Athletic* was soon proven by video evidence as well.  Video footage with clear "banging" sounds surfaced on social media and in the news, and further reinforced the idea that the players were using the trash can banging as an audio cue to create a significant competitive advantage for the Astros' hitters.

56.     Less than a week after *The Athletic* brought the Astros Trash Can Scheme to light, further evidence continued to be exposed suggesting that MLB had known about and willfully ignored the sign-stealing plot.  A November 18, 2019 news report in the *Houston Chronicle* indicated that MLB had placed video monitors in Astros Minute Maid Ballpark to "listen for banging sounds emanating from the Astros dugout."[19] This shocking revelation was strong evidence that MLB knew of the Astros use of illegal sign-stealing mechanisms, yet failed to divulge the scheme to the public.

57.     MLB published the findings from its investigation into the Astros' alleged sign-stealing plot on January 13, 2020.  The report implicated the Astros in the alleged misconduct and revealed the following behaviors which reinforced the Astros culpability in the scheme:

   a.   At the beginning of the 2017 season, employees in the Astros' video replay review room began using the live game feed from the center field camera to attempt to decode and transmit opposing teams' sign sequences (*i.e.*, which sign flashed by the catcher is the actual sign) for use when an Astros runner was on second base. Once the sign sequence was decoded, a player in the video replay review room would act as a "runner" to relay the information to the dugout, and a person in the dugout would notify the players in the dugout or

[19] Chandler Rome, MLB told video monitors to listen for Astros' banging sounds in 2019, THE HOUSTON CHRONICLE (Nov. 18, 2019), https://www.houstonchronicle.com/sports/astros/article/MLB-told-video-monitors-to-listen-for-Astros-14844792.php (accessed Feb. 4, 2020).

      signal the sign sequence to the runner on second base, who in turn would decipher the catcher's sign and signal to the batter from second base.

    b.  Approximately two months into the 2017 season, a group of players, including Carlos Beltrán, discussed that the team could improve on decoding opposing teams' signs and communicating the signs to the batter. Cora arranged for a video room technician to install a monitor displaying the center field camera feed immediately outside of the Astros' dugout . . . . One or more players watched the live feed of the center field camera on the monitor, and after decoding the sign, a player would bang a nearby trash can with a bat to communicate the upcoming pitch type to the batter.

    c.  The Astros' replay review room staff continued to decode sequences using the monitors in the room and communicate those sequences to the dugout for use when a runner was on second base.  Both methods of sign-stealing were used by the team in parallel throughout the 2017 season.[20] (hereinafter, the "Astros Replay Room Scheme")

    58.    The Trash Can Scheme and Replay Room Scheme employed by the Astros inflated the Astros player's statistics while deflating the opposing pitcher's individual performance statistics of the opposing pitchers.  This illegal manipulation of the metrics relied upon by DFS contestants in their decision-making processes with regard to their DFS wagers was a blatant affront to the DFS competing public.

    59.    Despite MLB's knowledge that the Astros were simultaneously compromising the integrity of baseball and corrupting the outcomes of DFS contestants' fantasy contests, it continued to unabashedly promote DraftKings' Fantasy contests to their own financial benefit, but to the financial detriment of Plaintiff and the Class.

    60.    The November 12, 2019 report by *The Athletic* regarding the Astros' technology-assisted sign-stealing scheme made clear that such illegal conduct was not limited to the Astros

---

[20] *See* Manfred, *supra,* at note 17.

organization.  Indeed as Rosenthal and Drellich wrote, "electronic sign-stealing [was] not a single team issue."[21]  On January 2, 2020, *The Athletic* bolstered this claim by publishing allegations that the Red Sox had utilized their own replay room scheme during the 2018 MLB season.[22]  These claims were substantiated by information that came from sources within the Red Sox organization.[23]

61.     In 2018, the Boston Red Sox hired Alex Cora, one of the two suspected master minds of the Houston Astros Trash Can Scheme, as their manager. Having won a World Championship with the Astros in 2017, Cora sought to implement a similar replay room scheme to the one that had been utilized in Houston the previous year.  As Rosenthal and Drellich describe, "three people who were with the Boston Red Sox during their 108-win 2018 season" had informed them that "at least some players visited the video replay room during games to learn the sign sequence opponents were using."[24]

62.     The Red Sox Replay Room Scheme had a similar harmful effect on Plaintiff and the Class, to the schemes that were utilized by the Houston Astros, beginning in 2017.  The Red Sox' sign-stealing plot tainted the outcomes of fantasy baseball contests, by improperly distorting the performance statistics of Red Sox players and opponents during the 2018 season.

---

[21] *See* Rosenthal & Drellich, *supra,* at note 14.

[22] Ken Rosenthal & Evan Drellich, *MLB's sign-stealing controversy broadens: Sources say the Reed Sox used video replay room illegally in 2018,* THE ATHLETIC (Jan. 7, 2020), https://theathletic.com/1510673/2020/01/07/mlbs-sign- stealing-controversy-broadens-sources-say-the-red-sox-used-video-replay-room-illegally-in-2018/ (accessed Feb. 4, 2020).

[23] *Id.*

[24] *Id*.

63. Defendants had knowledge that the outcomes of fantasy baseball contests were being corrupted yet continued to induce Plaintiff and other members of the fantasy baseball playing Class to participate in these wagering contest. This inducement, while financially lucrative for Defendant MLB, was to the financial detriment of Plaintiff and the Class.

64. According to a report by Tom Verducci of Sports Illustrated, during MLB's investigation of the Astros electronic sign-stealing scheme, individuals within the Astros organization communicated that at least eight other MLB teams were also utilizing technology to illegally stealing signs.[25] Acknowledging the likelihood that one of these eight teams was the Red Sox, an additional seven MLB teams have not been identified to date.

65. The Astros Trash Can Scheme and Replay Room Scheme and the Red Sox Replay Room Scheme, all violations of MLB Rules and regulations, had the common effect of distorting individual player statistics. These intentional and impermissible manipulations of metrics such as hits, runs, homeruns, wins and losses—which are central to every fantasy-wagering contestants' decision-making process—resulted in DFS contestants participating in dishonest and unfair wagering competitions. The Astros and Red Sox misconduct, in conjunction with Defendant MLB's concealment and failure to prevent this behavior inextricably harmed Plaintiff and the Class.

---

[25] *See* Tom Verducci, *Why MLB Issued Historic Punishment to Astros for Sign Stealing*, SPORTS ILLUSTRATED (Jan. 13, 2020), https://www.si.com/mlb/2020/01/13/houston-astros-cheating-punishment (accessed Jan. 22, 2020).

66.     The decision-making of wagering contestants was influenced by the statistical manipulations resulting from the electronic sign-stealing schemes in a myriad of ways, including, but not limited to the following:

a. As a result of the tainted player statistics resulting from the Trash Can Scheme or Replay Scheme, DFS contestants overpaid when they chose Astros or Red Sox players for their DFS teams based on artificial statistics created by the Trash Can Scheme or Replay Room Scheme.

b. DFS contestants who engaged in competition against other contestants who had selected Astros and Red Sox players when the Astros and Red Sox were playing in their home stadiums, were harmed when the Astros and Red Sox players' statistics were improperly enhanced as a result of the Trash can Scheme and Replay Room Schemes.

c. DFS contestants who drafted pitchers for their fantasy lineup who were competing against the Astros or Red Sox players who were competing in their home stadiums were harmed when those pitchers performed poorly as a result of the Trash Can Scheme and/or Replay Room Schemes.

d. MLB and the Astros and Red Sox teams, fraudulently induced DFS contestants to pick Astros or Red Sox players for their fantasy teams based on manipulated statistics. Similarly DFS contestants were induced not to select pitchers who had performed poorly in games against the Astros and Red Sox at their home stadiums, and were harmed when the Astros or Red Sox players did not perform as well as expected in away games (or the unselected pitchers performed better) as a result of not having access to the Trash Can Scheme or Replay Room Scheme.

67.     Defendant MLB and its constituent teams have wrongfully solicited contestants to compete in DFS wagering contests, despite possessing knowledge that the outcome of these fantasy games was being unduly influenced by the electronic sign-stealing schemes. MLB and its member teams have derived enormous financial benefit from their partnerships with DraftKings, at the expense of Plaintiff and members of the Class.

68.     Plaintiff Christopher Clifford actively participated in DFS contests during the time period relevant to this lawsuit.

69.     Had Plaintiff been privy to Houston Astros Trash Can Scheme and Astros Replay Room Scheme, he would not have entered into DFS contests during the Class Period.

70.     Had Plaintiff been privy to the Red Sox Replay Room Scheme, he would not have entered into DFS contests during the Class Period.

71.     Had Plaintiff known that the integrity of the players performance statistics on which he based his wagers were being intentionally compromised by MLB teams' and players' electronic sign-stealing schemes, he would not have entered into DFS contests during the Class period.

72.     Had Plaintiff known that MLB had knowledge of, yet failed to remedy or expose these illegal electronic sign-stealing schemes that compromised the honesty of the player performance statistics that informed his wagering decisions, he would not have entered into DFS contests during the Class Period.

## V.     EFFECTS OF THE SCHEME AND DAMAGES TO THE PLAINTIFF AND THE CLASS

73.     Because of their unlawful conduct, the Defendants and the members of its teams have profited massively, at the expense of the Plaintiff and the other similarly situated members of the Class by promoting DFS contests and promoting participation of individuals in soliciting contestant wagers.

74.     The benefits that the Defendants reaped from their misconduct, include but not limited to their percentage of the fees in connection with fantasy baseball fees.  Equally

significant, MLB and the members of its teams reaped substantial benefits from the participation

of an expanding fan base in the game that requires wagering by the fantasy baseball participants

which produced in addition to rising revenues from the sales of all paraphernalia by Defendants

MLB, a heightened involvement by fans, elevated turnout of fans and increased revenue from the

advertisements and television commercials.[26]

## VI.    CLASS ACTION ALLEGATIONS

75.    Plaintiff Christopher Clifford brings this action on behalf of himself and all others

similarly situated and seeks damages against MLB based on allegations of wrongful conduct.

76.    Plaintiff brings this action on behalf of himself and all others similarly situated

under Rules 23(a) and 23(b)(1), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, as

representatives of the class defined as follows (the "Class"):

> All individuals that participated in MLB DFS contests that took place between April 2,
> 2017 and October 30, 2019 and paid an entry fee for, and entered a lineup into, an MLB
> DFS contest held by DraftKings and/or FanDuel.

77.    Plaintiff seeks pursuant to FLA. STAT., Ch. 501, §§ 501.201-501.213, a

certification of a claim for violations of the above-mentioned, and or a similar statute in any other

jurisdiction such as: Alabama, Alaska, Arkansas, California, Colorado, Connecticut, Delaware,

District of Columbia, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky,

---

[26] Brent Schrotenboer, *Leagues see real benefits in daily fantasy sports*, USA TODAY (Jan. 1, 2015),
https://www.usatoday.com/story/sports/2015/01/01/daily-fantasy-sports-gambling-fanduel-draftkings-nba-nfl-mlb-
nhl/21165279/ (accessed Feb. 4, 2020)

Case 1:20-cv-01000   Document 1   Filed 02/05/20   Page 27 of 60

Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming.

78.     Plaintiff believes that members of the class are numerous and widely dispersed throughout the United States. Defendants operated in all 43 states as well as the District of Columbia and collected fees and revenues from other States in addition to collecting fees and revenues from the State of New York. Members of the class are so numerous and geographically dispersed that joinder of all members is impracticable. Fiven the costs of complex litigation, it would be uneconomic for many plaintiffs to bring individual claims and join them together.

79.     Members of the class are readily identifiable from information and records in Defendants' possession, including MLB or in the possession of wagering sites.

80.     Plaintiff's claims are typical of the claims of the members of the class. Plaintiff and all members of the Class were damaged by the same wrongful conduct of Defendants.

81.     Plaintiff will fairly and adequately protect and represent the interests of all members of the Class. The interests of Plaintiff are coincident with, and not antagonistic to, those of the other members of the Class.

82.     All Defendants are guilty of wrongful conduct and concealed the existence of their misconduct.  Plaintiff and all members of the Class, without any fault or lack of due diligence on their part, were unaware of the misconduct and all the facts that gave rise to this action and could not have reasonably discovered Defendants' misconduct.

83.     Plaintiff is represented by Counsel with experience in the prosecution of class action.

84.     Questions of law and fact common to the members of the class predominate over questions that may affect only individual class members, because Defendants have acted on grounds generally applicable to the entire class, thereby making overcharge damages with respect to the class as a whole appropriate. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

85.     Questions of law and fact common to the class include:

    a.   Whether Defendants' conduct was unlawfully maintained and engaged in a false, deceptive, misleading and/or unfair acts or practices;

    b.   Whether Defendants' conduct was unlawful in that they violated state consumer protection statutes and/or other laws;

    c.   Whether MLB Defendants are liable to Plaintiff and the Class for compromising the fairness of DFS contests;

    d.    Whether MLB Defendants' conduct constituted negligence;

    e.   Whether Defendants' scheme, in whole or in part, has substantially affected commerce;

    f.   Whether Defendants' unlawful agreement, in whole or in part, caused injury through overcharges to the business or property of Plaintiff and the members of the Class;

    g.   Whether the MLB Defendants have been unjustly enriched by their conduct;

    h.   Whether Defendants Astros are liable to Plaintiff and the Class for compromising the fairness of DFS contests;

    i.   Whether Defendants Astros' conduct was unlawful in that they violated the Texas Deceptive Trade Practices Act;

    j.   Whether Defendants Astros engaged in a false, deceptive, misleading and/or unfair acts or practices;

k.   Whether Defendants Astros have been unjustly enriched by their conduct;

l.   Whether Defendants Red Sox are liable to Plaintiff and the Class for compromising the fairness of DFS contests;

m.   Whether Defendants Red Sox' conduct was unlawful in that they violated the Massachusetts Consumer Protection Act;

n.   Whether Defendants Red Sox engaged in a false, deceptive, misleading and/or unfair acts or practices;

o.   Whether Defendants Red Sox have been unjustly enriched by their conduct;

p.   The value and determination of a reasonable estimate of the amount of damaged caused by Defendants' unlawful conduct; and

q.   Whether Plaintiff and the Class are entitled to restitution, disgorgement and/or other equitable or injunctive relief.

86.   Class action treatment is a superior method for the fair and efficient adjudication of this controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism—including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually—substantially outweighs potential difficulties in management of this class action.

87.   Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

88.   Class certification, therefore, is appropriate under FED. R. CIV. P. 23(b)(3) because common questions of law or fact to members of the Class (listed above) predominate over any questions affecting individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

89.     Class certification is also appropriate under FED. R. CIV. P. 23(b)(1), because the prosecution of separate actions by the numerous individual members of the Class would create a risk that inconsistent or varying adjudications would establish incompatible standards of conduct for the parties opposing the Class, and may substantially impair or impede the ability of other members of the Class to protect their interests.

90.     Class certification is also appropriate under FED. R. CIV. P. 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

91.     Plaintiff reserves the right to expand, narrow or otherwise modify or refine the definition of the Class based on additional information obtained through further investigation and discovery, and/or in order to accommodate any of the Court's manageability concerns.

## VII.    CONCEALMENT TOLLED THE STATUTE OF LIMITATIONS

92.     A cause of action accrued for Plaintiff and the Class each time Defendants accepted a fee from Plaintiff or a member of the Class. Each sale by Defendants constituted another overt act in furtherance of their unlawful misconduct. Accordingly, Plaintiff and the Class are entitled to recover all damages on all sales that Defendants made to Plaintiff and the Class within the class period.

93.     This is true because the nature of Defendants' scheme was self-concealing and because the Defendants employed deceptive tactics and techniques of secrecy to avoid detection of, and to conceal, their contract, combination, conspiracy and scheme.

28

94.     Defendants wrongfully and affirmatively concealed the existence of their ongoing

combination and conspiracy from Plaintiff and members of the class by, among other things,

every time MLB Defendants:

   a.   affirmatively concealed and/or failed to disclose the existence of electronic
        sign-stealing misconduct even though they knew or should have known that
        this misconduct would compromise the honesty and fairness of MLB DFS
        contests;

   b.   disregarded the fact that their concealed secret electronic sign-stealing
        misconduct would compromise the performance statistics of MLB players;

   c.   promoted wagering in MLB DFS contests despite having knowledge that
        rampant electronic sign-stealing compromised the honesty and the integrity of
        those contests;

   d.   failed to take any reasonable steps to prevent and/or remedy the unlawful
        misconduct or disclose the compromised nature of fantasy contests.

Defendants acted in an unfair, deceptive, misleading and/or false manner.

## VIII.   CLAIMS FOR RELIEF

### COUNT ONE: UNFAIR/DECEPTIVE PRACTICES IN VIOLATION OF STATE
### CONSUMER PROTECTION STATUTES (AS AGAINST THE MLB DEFENDANTS)

95.     Plaintiff incorporates by reference and re-asserts all allegations described in this

Complaint.

96.     Plaintiff resides in the state of Florida. Florida law prohibits "[u]nfair methods of

competition, unconscionable acts or practices and unfair or deceptive acts or practices in the

conduct of any trade or commerce." FLA. STAT. § 501.204, et seq. (the "Florida Consumer

Protection Statute").

97.     MLB Defendants have a principal place of business in New York, New York.

Through their partnership with DraftKings Inc., an entity with a principal place of business in

29

Boston MA, MLB Defendants committed "unfair and deceptive acts" in the state of

Massachusetts. Massachusetts prohibits "unfair or deceptive acts or practices in the conduct of

any trade or commerce . . . ." M.G.L. c. 93A § 2 *et seq*. (the "Massachusetts Act").

98.    MLB Defendants, at all times material to this lawsuit have engaged in unfair and

deceptive acts that violate the Florida Consumer Protection Statute, the Massachusetts Act and,

as described below, other state consumer protection acts.

99.    MLB Defendants' conduct alleged herein constituted an "unfair and deceptive

act" and thus violates the Florida Act as well as other state consumer protections laws set forth

below.

100.   Any individual who has incurred a loss resulting from a violation of the Florida

Act, is entitled to bring an action based upon MLB Defendants unfair and/or deceptive acts and

practices.

101.   MLB Defendants have broadcast, advertised, promoted and sold merchandise in

every state in the country.  Contestants in DraftKings' fantasy baseball contests reside in every

state in which MLB engages in business on behalf of its constituent members' teams. Defendant

MLBAM's internet and interactive services are provided in every state in the country.  Moreover,

Defendant MLBAM coordinates the partnership between DraftKings and Major League baseball

and its teams. MLB Defendants have therefore engaged in trade and commerce as defined by

Florida's and all other state's Consumer Protections Act.

102.   At all material times to this lawsuit, MLB Defendants had an investment in

DraftKings, actively promoted a partnership with DraftKings, and continuously solicited

participation in DraftKings' fantasy baseball contests. MLB received substantial financial benefit as a result of its partnership with DraftKings.

103.    As fan participation increased in DraftKings fantasy baseball contests, so too did MLB's financial gains. By having a stake in the fees paid to DraftKings by fantasy contest participants, and by receiving sponsorship and advertising revenues, MLB benefited greatly from the MLB/DraftKings partnership.  Furthermore, the resulting uptick in interest in Major League baseball resulted in increased viewership, attendance, and general interest, and increased MLB's broadcasting, advertising, attendance and merchandise sales revenues.

104.    MLB Defendants had a vested interest in promoting DraftKings and in providing DraftKings with collaborative promotional, sponsorship and advertising opportunities. Motivated by the prospect of significant financial gains, MLB Defendants knowingly continued to aggressively promote their partnership with DraftKings, despite knowing that the DraftKings fantasy baseball contests were being compromised by the unfair and illegal conduct of MLB's constituent teams.

105.    Concurrent with an aggressive promotional campaign, MLB Defendants knew and failed to adequately deter, investigate or stop electronic sign-stealing schemes described herein, which corrupted MLB player performance statistics, in turn tainting the fantasy baseball contests in which Plaintiff and Class members participated. More specifically, MLB Defendants knew of, yet failed to halt, the Houston Astros Trash Can Scheme and Replay Room Scheme and the Boston Red Sox Replay Room Scheme, all three of which were clearly against MLB Official Rules.

106.    Not only did MLB Defendants know of the sign-stealing schemes described herein, but more egregiously, they affirmatively concealed and withheld from the public, the schemes being employed by the Houston Astros and the Boston Red Sox. MLB Defendants were aware that by concealing the conduct of MLB constituent teams, they were compromising the honesty and integrity of DFS contests that MLB promoted.

107.    MLB Defendants had knowledge or recklessly disregarded the fact that games played by the Houston Astros and Boston Red Sox, at times material to this lawsuit, were being compromised, as were the Astros', Red Sox', and their opponents' performance statistics.

108.    MLB Defendants' concealment of and failure to take remedial steps against its constituent teams' misconduct that it knew was impacting the honesty and integrity of the DraftKings MLB DFS wagering contests it continued to promote, constitutes "unfair and deceptive practices," conduct which violates M.G.I. c 93A and the state consumer protection acts listed below.

109.    MLB Defendants have engaged in unfair, deceptive, misleading and/or false acts or practices; conduct which is not permissible under M.G.I c. 93A *et seq*, and the state consumer protection acts listed below.

110.    Like M.G.L. c. 93A *et seq.*, a significant number of states' consumer protection statutes closely track the language of the Federal Trade Commission Act ("FTCA"), proscribing "unfair or deceptive acts or practices in or affecting commerce[.]" 15 U.S.C. § 45(a)(1). The following states have consumer protection statutes that prohibit unfair and/or deceptive acts or practices:

a. **Alaska:** ALASKA STAT. § 45.50.471, *et seq*. provides that "unfair methods of competition and unfair or deceptive acts or practices in trade or commerce are declared to be unlawful."

b. **California:** CAL. BUS. & PROF. CODE § 17200, *et seq*. prohibits any "unlawful, unfair or fraudulent business act or practices."

c. **California:** CAL. CIV. CODE § 1750, *et seq.*, prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]"

d. **Colorado:** COLO. REV. STAT. § 6-1-101, *et seq*. prohibits a broad range of "deceptive trade practices," including knowingly making various false representations concerning goods, services, or property.

e. **Connecticut:** CONN. GEN. STAT. § 42-110b, *et seq*. provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

f. **Florida:** FLA. STAT. § 501.204, *et seq*. provides that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

g. **Georgia:** OFFICIAL CODE OF GA. § 10-1-390, *et seq*. provides that "unfair or deceptive acts or practices in the conduct of consumer transaction and consumer acts or practices in trade or commerce are declared unlawful."

h. **Hawaii:** HAW. REV. STAT. § 480, *et seq*. provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful."

i. **Illinois:** ILL. COMP. STAT. § 505/1, et seq. and § 510/1, et seq. provides "unfair or deceptive acts or practices . . . in the conduct of any trade or commerce are hereby declared unlawful."

j. **Iowa:** IOWA CODE § 714.16, *et seq*. prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise…"

k. **Kentucky:** KY. REV. STAT. ANN. § 367.110, *et seq*. prohibits "[u]nfair, false, misleading or deceptive acts or practices in the conduct of any trade or commerce"

l. **Louisiana:** LA. REV. STAT. ANN. § 51.1405, *et seq*. provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

m. **Maine:** ME. REV. STAT. TIT. 5, § 205-A, *et seq*. provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful."

n. **Maryland:** MD. CODE ANN., MD COM. LAW § 13-101, *et seq*. provides that [a] person may not engage in any unfair or deceptive trade practice, as defined in this subtitle or as further defined by the Division, in: (1) The sale . . . of any consumer goods."

o. **Michigan:** MICH. COMP. LAWS § 445.901, *et seq*. prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce…"

p. **Mississippi:** MISS. CODE. ANN. § 75-24-1, *et seq*. prohibits "[u]nfair methods of competition affecting commerce and unfair or deceptive trade practices in or affecting commerce."

q. **Missouri:** MO. REV. STAT. § 407.010, et seq. makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise…"

r. **Montana:** MONT. CODE ANN. § 30-14-101, *et seq*. provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful."

s. **Nebraska:** NEB. REV. STAT. § 59-1601, et seq., § 87-301, *et seq*. provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful."

t. **New Hampshire:** N.H. REV. STAT. ANN. § 358-A:1, *et seq*. provides that "[i]t shall be unlawful for any person to use . . . any unfair or deceptive act or practice in the conduct of any trade or commerce within this state."

u. **New Mexico:** N.M. STAT. ANN. § 57-12-1, *et seq*. prohibits the "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful."

v. **North Carolina:** NC GEN. STAT. § 75-1.1, *et seq*. provides that "unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."

w. **Ohio:** OHIO REV. CODE ANN. § 1345.01, *et seq*. provides that [n]o supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction."

x. **Oklahoma:** OKLA. STAT. TIT. 15, § 751, *et seq*. provides that [a] person engages in a practice which is declared to be unlawful under the Oklahoma Consumer Protection Act... when, in the course of the person's business, the person: . . . (20) Commits an unfair or deceptive trade practice…"

y. **Pennsylvania:** 73 PA. STAT ANN. § 201-1, *et seq*. prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…"

z. **Rhode Island:** R.I. GEN LAWS § 6-13.1-1, *et seq*. provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful."

aa. **South Carolina:** S.C. CODE § 39-5-10, *et seq*. provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce declared unlawful."

bb. **Tennessee:** TENN. CODE ANN. § 47-18-104, *et seq*. prohibits "unfair or deceptive acts or practices affecting the conduct of any trade or commerce."

cc. **Texas:** TEX. BUS. & COM. CODE ANN. § 17.41, *et seq*. prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," and an unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree."

dd. **Vermont:** VT. STAT. ANN. TIT. 9, § 2451, *et seq*. provides that "unfair or deceptive acts or practices in commerce, are hereby declared unlawful."

ee. **Washington:** REV. CODE WA. § 19.86.010, *et seq*. provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

ff. **West Virginia:** W. VA. CODE § 46A-6-104, *et seq*. provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

gg. **Wisconsin:** WIS. STAT. § 100.20, *et seq*. prohibits "[u]nfair methods of competition in business and unfair trade practices in business."

hh. **Wyoming:** WYO. STAT. ANN. § 40-12-101, *et seq*. provides that "[a] person engages in a deceptive trade practice unlawful under this act when, in the course of his business and in connection with a consumer transaction, he knowingly: . . . [e]ngages in unfair or deceptive acts or practices.

111.  Consumers have a private right of action for the unfair and deceptive practices engaged in by MLB Defendants as described herein, as per the statutes identified in the preceding paragraph, the Florida Consumer Protection Act, as well as M.G.L. c. 93A *et seq*.  Such acts or practices are unlawful under these substantially similar or identical consumer protection and consumer fraud statutes.

112.  Plaintiff has asserted that MLB Defendants have violated the Massachusetts Consumer Protection Law, M.G.L. c.93A *et seq*. ("MCPL") and the Georgia Fair Business Practices Act, O.C.G.A § 10-1- 399(b).  Plaintiff is not required to provide MLB Defendants with pre-suit written demand for relief pursuant to M.G.L 93A § 9(3) or O.C.G.A § 10-1- 399(b), because MLB Defendants do not maintain property, nor do they maintain a place of business in Massachusetts or Georgia.

113.  Plaintiff intends to assert that MLB Defendants have violated the Mississippi Consumer Protection Act ("MCPA") As required by MISS. CODE. ANN. § 75-24- 15, Plaintiff plans to use an informal dispute resolution program approved by Attorney General, to try to

resolve this MCPA claim.  Plaintiff maintains the right, subject to the outcome of the dispute

resolution undertaking, to amend the Complaint on behalf of himself and the Class, to include a

Claim for Relief pursuant to MISS. CODE. ANN. § 75-24-1 *et seq.* and demand all appropriate

relief under the MCPA.

114.    Plaintiff intends to assert that MLB Defendants have violated the Maine Unfair

Trade Practices Act ("MeUTPA").  Pursuant to ME. REV.STAT.§ 212 TIT. 5 § 213(1-A, Plaintiff

has provided MLB Defendants with the requisite written demand for relief describing the

particular violations of MeUTPA.  Within 30 days, subject to MLB Defendants' answer, Plaintiff

maintains the right to amend the Complaint to assert that MLB Defendants' conduct described

herein has violated ME. REV. STAT. § 212 TIT. 5 § 205-A, *et seq.* and demand all appropriate

relief under the MeUTPA.

115.    Plaintiff intends to assert that MLB Defendants have violated the Texas Deceptive

Trade Practices Act ("TDTPA").   Pursuant to TEX. BUS. & COM. CODE §17.505, Plaintiff has

provided MLB Defendants' with written notice of the specific complaint and damages. As per the

statute, MLB has 60 days to respond to this Claim for Relief, which provides notice to MLB

Defendants of the prospective claim against it by Plaintiff and the Class. Plaintiff maintains the

right, subject to MLB Defendants' response, to amend the Complaint on behalf of himself and

the Class, to include a Claim for Relief pursuant to TEX. BUS. & COM. CODE §17.505. and

demand all appropriate relief under the TDTPA.

116.    Plaintiff intends to assert that MLB Defendants have violated the Wyoming

Consumer Protection Act ("WCPA") . Pursuant to WYO. STAT. ANN. § 40-12-101, Plaintiff has

provided MLB Defendants with written notice describing the nature of the violations of WCPA

37

pursuant to WYO. STAT. ANN. § 40-12-109. This Claim of Relief provides MLB Defendants with notice of the prospective claim against it by Plaintiff and the Class. Plaintiff maintains the right, subject to MLB Defendants' response within 15 days, to amend the Complaint on behalf of himself and the Class, to include a Claim for Relief pursuant to WYO. STAT. ANN. § 40-12-101and demand all appropriate relief under the WCPA.

117.    Plaintiff intends to assert that MLB Defendants have violated West Virginia Consumer Credit and Protection Act ("WVCCPA").  Pursuant to W. VA. CODE § 46A-6-106(c), Plaintiff has provided MLB Defendant with written notice of the alleged violations, which has been sent by certified mail, return receipt requested.  Plaintiff maintains the right, subject to MLB Defendants' response, to amend the Complaint on behalf of himself and the Class, to include a Claim for Relief pursuant to W. VA. CODE § 46A-6-106(c) and demand all appropriate relief under the WVCCPA.

118.    MLB Defendants, through its conduct asserted herein, have violated the foregoing state consumer protection statutes, by engaged in unfair and deceptive acts that these state statutes expressly prohibit.

119.    Plaintiff and the Class were, and continue to be, injured by MLB Defendants' unfair, deceptive, misleading and/or false practices or acts.  MLB's conduct has and continues to foreseeably and proximately violate FLA. STAT. § 501.204, et seq, M.G.L. c. 93A et seq. and all consumer protection statutes described in the preceding paragraphs. As a result of MLB Defendants' dishonest behaviors, Plaintiff and other Class members have continuously incurred significant financial injury, including, but not limited to the money wagered on DraftKings's dishonest and corrupt fantasy baseball competitions.

120.    The willful and/or reckless behavior that MLB Defendants engaged in, put their

own financial interests ahead of the rights of Plaintiff and similarly situated fantasy baseball

contestant class members.  As per the consumer protection statutes identified in the above

paragraphs, Plaintiff and the Class are entitled to and deserving of all of the available remedies

and damages including, but not limited to statutory damages, actual damages, injunctive or other

equitable relief as well as reasonable attorney's fees and costs. Further, because the MLB

Defendants acted willfully or knowingly, Plaintiff and the Class are entitled to recover three

times the actual damages they incurred, as well as exemplary and punitive damages and

attorney's fees as applicable, and set forth in the  consumer protection statutes set forth  in the

above paragraphs.

**COUNT TWO: UNJUST ENRICHMENT (AS AGAINST MLB DEFENDANTS)**

121.    Plaintiff incorporates by reference and re-asserts all of the allegations described in

this Complaint.

122.    MLB Defendants have attained significant financial benefit from their partnership

with DraftKings, at all times relevant to this lawsuit.  In promoting participation in MLB DFS

contests, MLB Defendants have acquired a substantial monetary stake in the revenue generated

from contestants' entry fees, advertising and sponsorships.

123.    As the popularity of DFS contests grew and continues to grow, so too does the

MLB Defendants' financial benefit. Increased participation in fantasy competitions by Plaintiff

and the Class resulted and continues to result in the increased revenue streams described in the

preceding paragraph.  Furthermore, by inducing Plaintiff and Class members to participate in

fantasy games, MLB Defendants benefited and continue to benefit from the ensuing upticks in

revenue generated by broadcasting, game attendance, advertising and sales of merchandise and paraphernalia.

124.    MLB Defendants, at all times relevant to this Complaint, promoted MLB DFS contests to achieve or increase their financial gain.

125.    MLB Defendants, at all times relevant to this Complaint, knew but did not disclose that that Houston Astros and the Boston Red Sox were violating MLB Rule and regulations by employing sign-stealing schemes, which rendered player performance statistics dishonest.  In turn, these compromised statistics tainted and corrupted DraftKings' fantasy baseball contests.

126.    Plaintiff and the Class incurred significant financial loss by paying entry fees and wagering on MLB and DraftKings' MLB DFS contests, and additionally incurred further loss through the Defendants' broadcasting, advertising and sale of merchandise.

127.    Defendants acted knowingly and intentionally in failing to stop or remedy said wrongful conduct, while enjoying the monetary benefits conferred upon them by Plaintiff and the Class as a result of this wrongful conduct.

128.    MLB Defendants should not be permitted, under principles of equity and good conscience, to retain the foregoing monetary benefits that were the product of their deceitful behavior and incurred at the expense of Plaintiff and the Class.

129.    The Defendants' wrongful conduct is a direct, foreseeable and proximate cause of the losses incurred by Plaintiff and the Class.

130.    MLB Defendants are liable to Plaintiff and the Class for the monetary benefit realized through their deception, including, but not limited to, the profits and other wrongfully

obtained benefits.

131.     In order to adequately compensate Plaintiff and Class, MLB Defendants should be compelled to disgorge all unjust proceeds received or realized as a result of their wrongful conduct, into a constructive trust or common fund for the benefit of Plaintiff and the Class.

### COUNT THREE: NEGLIGENCE (AS AGAINST MLB DEFENDANTS)

132.     Plaintiff incorporates by reference and re-asserts all of the allegations described in this Complaint.

133.     MLB Defendants, at all times relevant to the lawsuit, had a vested financial interest in DraftKings, and through a partnership with DraftKings, promoted DraftKings' MLB DFS contests and actively solicited contestant participation.

134.     MLB Defendants realized substantial financial gain through their partnership with DraftKings and promotion of DraftKings' MLB DFS contests at all times relevant to this lawsuit.

135.     MLB Defendants knew or should have known at all times relevant to this lawsuit that the reliance on the honesty and accuracy of MLB player performance statistics was critical to the decision-making processes associated with fan's decision to enter and compete in DraftKings' MLB DFS contests.

136.     MLB Defendants knew or should have known, at all times relevant to this lawsuit,  that DraftKings' MLB DFS contestants were blind to the fact that Defendant MLB's constituent teams, including the Astros and the Red Sox, were  utilizing illegal electronic sign-stealing schemes, in violation of MLB's Rules and regulations, and  compromising the honesty and integrity of DraftKings' fantasy baseball contests.

41

137.    Because MLB Defendants had an ownership stake in DraftKings, aggressively promoting the partnership to their financial benefit, and by virtue of the fact that MLB Defendants had knowledge that the decision to participate in DraftKings' MLB DFS contests hinged upon the assumed accuracy and  honesty of MLB player performance statistics, MLB Defendants had a duty to investigate team and player misconduct, and to take reasonable steps to ensure that player performance statistics were not compromised by team or player misconduct. Furthermore, MLB Defendants' had a duty to take reasonable steps to prevent or deter its constituent teams or players from acting in a way that may result in tainted player performance statistics and to disclose any information about these manipulative behaviors to DraftKings' MLB DFS contestants.

138.    MLB Defendants breached their obligation to Plaintiff and the Class, despite the fact that they knew or should have known MLB members teams or player misconduct was tainting MLB player performance statistics. MLB Defendants' duty to Plaintiff and the Class was breached as follows:

a.   MLB Defendants did not take steps to assure that player performance statistics remained honest, accurate and uninfluenced by team or player misconduct;

b.   MLB Defendants did not adequately investigate reported team or player conduct that may have rendered MLB player performance statistics dishonest;

c.   MLB Defendants failed to take reasonable steps to prevent or deter any constituent team or player misconduct that compromised the fairness and authenticity of player performance statistics; and

d.   MLB Defendants failed to disclose to potential DraftKings' MLB DFS contestants' information that they knew or should have known, regarding teams or player misconduct that might have dishonestly influenced the integrity of MLB player   performance statistics.

139.    Plaintiff and the Class have suffered injury as a direct, foreseeable and proximate result of MLB Defendants negligent behavior and are entitled to damages in an amount proven at trial.

### COUNT FOUR:  VIOLATION OF TEXAS BUSINESS AND COMMERCE CODE DECEPTIVE TRADE PRACTICES STATUTES  §  17.41 (AS AGAINST DEFENDANT ASTROS)

140.    Plaintiff incorporates by reference and re-asserts all of the allegations as described in this Complaint.

141.    Plaintiff alleges that the Defendants Astros violated the Texas Deceptive Practices Statute ("TDP"). Specifically, Plaintiff alleges that the Defendants violated § 17.41 of the TDP in that their conduct was "(a) false, misleading, or deceptive acts or practices in the conduct of any trade or commerce" and accordingly was and shall be declared unlawful and subject to action by the Consumer Protection division under §§17.47, 17.58, 17.60 and 17.61 of the TDP.

142.    Plaintiff alleges that at all time and during the Class period, Defendants Astros were engaged in false, misleading and/or deceptive acts and practices that violated §17.41 of the TDP.

143.    Plaintiff alleges that he and all person similarly situated who suffered injury and/or financial loss as a result of the Defendants' violation has the standing to bring an action based on the false, misleading and/or deceptive acts and practices.

144.    Defendants Astros are a baseball team and their games are broadcasted, advertised and promoted in State of Texas and throughout the United States. In addition, their professional baseballs games in which the Astros are involved in are held in the State of Texas and throughout

the United States. Among other things, they sale merchandise and paraphernalia in the State of

Texas and throughout the United States. Accordingly, the Defendants Astros were and still are

engaged in trade and commerce under the DTP.

145.    Plaintiff alleges that in addition to the above, the participants of the daily fantasy

sports, who wager on contests were affected by the performance of the players and statistics

involving the Defendants Astros, resided during the Class period in the State of Texas and

throughout the United States.

146.    Defendants Astros entered into a partnership with DraftKings and promoted this

partnership and participated in soliciting participants and fan base through DraftKings MLB DFS

contests on a daily and weekly basis.

147.    This partnership with DraftKings allowed the Defendants Astros to realize

enormous financial benefits during the Class period, as they shared revenues and profited from

the participation of fan base in the fantasy baseball contest through the collection of entry fees,

from advertisements, promotions and sponsorships.

148.    This partnership with DraftKings with a full schedule of games available each day

and plentiful and easy-to-follow stats, allowed the Defendants to gain exposure in the world

through substantially heightened presence with fan base increased awareness, interest, viewing

and participation in Major League Baseball, and in addition the sale of merchandise and

paraphernalia, which includes Defendants the Astros and resulting in significantly increased

financial benefits to Defendants Astros.

149.    Accordingly, Defendants Astros had an ulterior motive to pursue their support,

sponsorship, advertising and promotion of fantasy baseball during the Class period while at all

time they knew or should have knowns that these contest were unfair, deceptive, misleading and compromised as a direct, foreseeable and proximate cause of Defendants Astros' misconduct.

150.    At all times and during Class period, as described above, Defendants Astros were engaged in electronic sign stealing scheme through the Replay Room scheme and Trash Can scheme, which directly resulted in dishonest, compromised and misleading Major League Baseball player performance statistics and which were in violations of the rules, regulations and directives of Major League Baseball, which rendered all the activities of DraftKings and its contests corrupt, tainted and tarnished contents.

151.    The Defendants Astros, at all times and during the Class period, knew or should have known, and/or were recklessly disregarded the electronic stealing scheme which resulted in misleading, false, dishonest and compromised player performance statistics.

152.    Further, the Defendants Astros engaged in a deceptive and affirmative scheme to conceal their secret electronic sign-stealing scheme, despite the fact that they knew, or should have known, or acted in reckless disregard to their unlawful actions and failed to maintain the integrity, honesty and fairness of the contest they were promoting and advertising through DraftKings' MLB DFS.

153.    In addition, through the support, promotion and sponsorship of DraftKings' DFS contest, the Defendants Astros knowingly allowed participants in Major League Baseball to wager on contests that were misleading, dishonest and unfair.  They also failed to take any reasonable steps to stop this unlawful conduct, or to prevent or remedy or disclose the unfair and misleading nature of these fantasy contest which constitutes false, unfair, misleading and/or deceptive practices.

154.    This deceptive, false, unfair and misleading conduct by Defendants Astros, is in violations TEX. BUS. & COM. CODE § 17.41 *et seq.*

155.    At all times and during the Class period, Plaintiff and members of the Class similarly situated are consumer that made payments for these Major League Baseball fantasy services and contests and they fall within the definition of TEX. BUS. & COM. CODE § 17.41 *et seq.* and thus suffered harm and injury because of these violations.

156.    The above described false, misleading and deceptive practices and conduct that was in violation of TEX. BUS. & COM. CODE § 17.41 *et seq.* were the direct, foreseeable and proximate cause of the injuries sustained by the Plaintiff and all members of the Class similarly situated.

157.    Plaintiff's and other members of the Class' injuries is measurable and ascertainable damages, which includes but not limited to the sum of money paid for fees and the sum of moneys for wagers on DraftKings' dishonest, corrupt and false baseball contests which the Defendants Astros was able to benefit and profit from.

158.    By means of this scheme, the Defendants Astros intentionally and wrongfully engaged in a wanton, willful conduct or reckless disregard to the integrity of the games and the rights of Plaintiff and other similarly situated members of the Class.

159.    But for the unlawful and misleading conduct and as a direct foreseeable and proximate result of the foregoing, Plaintiff and other similarly situated members of the Class are entitled to all damages and remedies that are available under TEX. BUS. & COM. CODE § 17.41 *et seq,* which includes, but is not limited to actual damages, statutory damages, injunctive relief

and any other equitable relief as this Court may deem just and proper including costs and reasonable attorneys' fees.

160.    Furthermore, since the scheme and wrongful conduct by the Defendants Astros was intentionally dishonest scheme, Plaintiff and the Class are entitled to recover up to three times their actual damages, or additional punitive or exemplary damages and attorneys' fees as applicable under the Deceptive Trade Practices Statute.

**COUNT FIVE:  UNJUST ENRICHMENT (AS AGAINST DEFENDANT ASTROS)**

161.    Plaintiff incorporates by references and re-asserts all of the allegations as described in this Complaint.

162.    The elements of unjust enrichments are simple and have been established by the unlawful conduct of the Defendants Astros in that that (1) the Defendants were enriched, (2) at that Plaintiff's expense and (3) that it is against equity and good conscience to permit the Defendants' Astros to retain what the sums of moneys and damages that the Plaintiff and other members of the class are seeking to recover.

163.    The Defendants Astros at all times and during the Class period has gained a significant financial profits by way of their partnership with DraftKings and by way of their participation, support, advertisement and promotion of the Major League Baseball contests and shared the revenues that were collected from various sources which include but are not limited to collecting directly from participants of fantasy baseball contests, from collecting fees, promotions, advertisement, broadcastings, sponsorships and/or sales.

164.    By virtue of having these Major League Baseball content, the fan base and fan awareness and participation increased substantially and it was the direct, foreseeable and

proximate cause of Defendants Astros increased financial gain and revenues which include but are not limited to collecting directly from participants of fantasy baseball contests, from collecting fees, promotions, advertisement, broadcastings, sponsorships and/or sales.

165.    The Defendants Astros, at all times and during the Class period supported and promoted DraftKings' MLB DFS contest for the purpose to inflate and elevate their financial stake and increased their revenues that were collected directly from participants of fantasy baseball contests, from collecting fees, promotions, advertisement, broadcastings, sponsorships and/or sales.

166.    The Defendants Astros, at all times and during the Class period supported and promoted as MLB DFS contest for the purpose of increasing their financial share.

167.    The Defendants Astros, at all times and during the Class period supported and promoted DraftKings' MLB DFS contest despite their knowing that it was engaged in a false, misleading and deceitful electronic stealing scheme and in violation of MLB's regulations, rules and instructions and despite that knowledge they did not disclose this scheme which was the direct, foreseeable and/or proximate case of the contests being tainted, corrupt, dishonest, false and/or misleading.

168.    The Plaintiff and other similarly situated members of the Class have paid substantial money in part as fees for their membership and/or entrance and/or participating in DraftKings' MLB DFS contests.  Further Plaintiff and other similarly situated members of the Class have remitted substantial money through broadcasting, attending, advertising, and purchasing paraphernalia.

48

169.   Defendants Astros, at all times and during the Class period conspired to willfully and knowingly maintain their financial stake and their partnership with DraftKings due to the financial benefits that they understood would be substantial and profitable.

170.   As a direct, foreseeable and proximate cause of Defendants Astros' unlawful actions, the Plaintiff and other similarly situated members of the Class have been and continue to be injured from their participation in the corrupt MLB DFS contest and therefore, liable for all damages in the amount of their financial gain that arose from these transactions, which include but is not limited to the profits, benefits, fees and other financial gain and revenue that were unlawfully realized.

171.   Defendants Astros should be made to surrender and renounce all the profits made from the illegally and unfairly obtained revenues and proceeds and further  be directed to deposit all these funds into a trust account to be set for the benefit of the Plaintiff and other situated members of the Class.

**COUNT SIX: VIOLATION OF THE MASSACHUSSETTS CONSUMER PROTECTION ACT (AS AGAINST DEFENDANT RED SOX)**

172.   Plaintiff incorporates by reference and re-asserts all of the allegations as described in this Complaint.

173.   Plaintiff alleges that the Defendants Red Sox violated the Massachusetts

174.   Consumer Protection Law ("MCPL").  Massachusetts has a statute that specifically enables consumers to take legal action against unfair or deceptive conduct in the marketplace under section 93A, which is the statute that the Plaintiff and other similarly situated members of the Class are relying on herein.

49

175.    Further, as a general matter, a consumer suing under this statute, specifically 93A § 9(3). must demonstrate that he sent a detailed 30-day written demand letter to the Defendant and outlined the Complaint, the harm that he suffered and the relief that is being sought.  The Plaintiff herein, has provided a written demand under this Statue. Subject to the Defendant Red Sox' response, if any is provided within 30 days, the Plaintiff and other similarly situated members of the Class, reserve the right to Amend this Complaint to include any other counts for relief.

176.    The Plaintiff alleges that at all times and during the Class period, he and other similarly situated members of the Class are and were "consumers" under the law as they engaged in commerce for personal purposes.

177.    Further, the Plaintiff alleges that at all time and during the Class period Defendant Red Sox was engaged in illegal unfair and deceptive practices in that they fail to disclose relevant information, they misled the participants of the Major League Baseball.

178.    That at all times, and during the Class period, Defendant Red Sox is a Major League baseball team.

179.    That at all times and during the Class period, Defendant Red Sox were engaged in trade and commerce under the MCPL.  The games are being held and are broadcasted, advertised and promoted in the State of Massachusetts and throughout the United States.  Furthermore, the sale of merchandise and paraphernalia is being sold in the State of Massachusetts and throughout the United States.

180.    Plaintiff alleges that in addition to the above, the participants of the daily fantasy sports, who wager on contests were affected by the performance of the players and statistics

involving Defendant Red Sox, resided during the Class period in the State of Massachusetts and throughout the United States.

181.    Any person who has suffered a loss is entitled to bring a legal action against any party for these damages, which may include double or treble damages, attorneys' fees and costs. Plaintiff alleges that the Defendant Red Sox' illegal actions resulted in a loss of money to Plaintiff and other similarly situated members of the Class.

182.    Defendant Red Sox entered into a partnership with DraftKings, promoted this partnership and participated in soliciting participants and fan base through DraftKings MLB DFS contests on a daily and weekly basis.  In addition, Defendants MLB had an ownership with DraftKings and DraftKings' MLB DFS which they promoted and advertised together with Defendants Red Sox.

183.    This partnership with DraftKings allowed the Defendants Red Sox to realized enormous financial benefits during the Class period, as they shared revenues and profited from the participation of fan base in the fantasy baseball contest through the collection of entry fees, from advertisements, promotions and sponsorships.

184.    This partnership with DraftKings with a full schedule of games available each day and plentiful and easy-to-follow stats, allowed the Defendants Red Sox to gain exposure in the world through substantially heightened presence with fan base increased awareness, interest, viewing and participation in Major League Baseball, and in addition the sale of merchandise and paraphernalia, which includes Defendants Red Sox and resulting in significantly increased financial benefits to Defendants.

185.   Accordingly, Defendant Red Sox had an ulterior motive to pursue their support, sponsorship, advertising and promotion of fantasy baseball during the Class period while at all time they knew or should have knowns that these contest were unfair, deceptive, misleading and compromised as a proximate cause of Defendant Red Sox' misconduct.

186.   At all times and during Class period, as described above, the Defendant Red Sox were engaged in electronic sign-stealing scheme through the Replay Room scheme and Trash Can scheme, which were the direct result in dishonest, compromised and misleading Major League Baseball player performance statistics and which were in violations of the rules, regulations and directives of Major League Baseball, which rendered all the activities of DraftKings and its contests corrupt, tainted and tarnished contents.

187.   At all times and during the Class period, Defendants Red Sox, knew or should have known, and/or were recklessly disregarded the electronic stealing scheme which resulted in misleading, false, dishonest and compromised player performance statistics.

188.   Further, Defendants Red Sox engaged in a deceptive and affirmative scheme to conceal their secret electronic sign-stealing scheme, despite the fact that they knew, or should have known, or acted in reckless disregard to their unlawful actions and failed to maintain the integrity, honesty and fairness of the contest they were promoting and advertising through DraftKings' MLB DFS.

189.   In addition, through the support, promotion and sponsorship of DraftKings' contest, Defendants Red Sox knowingly allowed participants in Major League Baseball to wager on contests that were misleading, dishonest and unfair.  They also failed to take any reasonable steps to stop this unlawful conduct, or to prevent or remedy or disclose the unfair and misleading

nature of these fantasy contest which constitutes false, unfair, misleading and/or deceptive practices.

190.    This deceptive, false, unfair and misleading conduct by Defendants Astros is in violations of Massachusetts General Law Chapter 93A § 2.

191.    At all times and during the Class period, Plaintiff and members of the Class similarly situated are consumer that made payments for these Major League Baseball fantasy services and contests and they fall within the definition of Massachusetts General Law Chapter 93A, and thus suffered harm and injury because of these violations.

192.    The above described false, misleading and deceptive practices and conduct that was in violation of Massachusetts General Law Chapter 93A were the direct, foreseeable and proximate cause of the injuries sustained by the Plaintiff and all members of the Class similarly situated.

193.    Plaintiff's and other members of the Class' injuries is measurable and ascertainable damages, which includes but not limited to the sum of money paid for fees and the sum of moneys for wagers on DraftKings' dishonest, corrupt and false baseball contests which Defendants Red Sox was able to benefit and profit from.

194.    By means of this scheme, Defendants Red Sox intentionally and wrongfully engaged in a wanton, willful conduct or reckless disregard to the integrity of the games and the rights of Plaintiff and other similarly situated members of the Class.

195.    But for the unlawful and misleading conduct and as a direct result of the foregoing, Plaintiff and other similarly situated members of the Class are entitled to all damages and remedies that are available under Massachusetts General Law Chapter 93A, which includes,

but is not limited to actual damages, statutory damages, injunctive relief and any other equitable relief as this Court may deem just and proper including costs and reasonable attorneys' fees.

196.    Furthermore, since the scheme and wrongful conduct by Defendants Red Sox was intentionally dishonest scheme, Plaintiff and other similarly situated members of the Class are entitled to recover up to three times their actual damages, or additional punitive or exemplary damages and attorneys' fees as applicable under the Deceptive Trade Practices Statute and/or Consumer Protection Law.

### COUNT SEVEN: UNJUST ENRICHMENT (AS AGAINST THE RED SOX)

197.    Plaintiff incorporates by reference and re-asserts all of the allegations as described in this Complaint.

198.    The elements of unjust enrichments are simple and have been established by the unlawful conduct of Defendants Red Sox in that that (1) the Defendants were enriched, (2) at the expense of Plaintiff and the Class, and (3) that it is against equity and good conscience to permit Defendant Red Sox to retain what the sums of moneys and damages that the Plaintiff and other members of the class are seeking to recover.

199.    Defendant Red Sox at all times and during the Class period has gained a significant financial profits by way of their partnership with DraftKings and by way of their participation, support, advertisement and promotion of the Major League Baseball contests and shared the revenues that were collected from various sources which include but are not limited to collecting directly from participants of fantasy baseball contests, from collecting fees, promotions, advertisement, broadcastings, sponsorships and/or sales.

200.     By virtue of having these Major League Baseball content, the fan base and fan awareness and participation increased substantially and it was the direct, foreseeable and proximate cause of Defendants Red Sox increased financial gain and revenues which include but are not limited to collecting directly from participants of fantasy baseball contests, from collecting fees, promotions, advertisement, broadcastings, sponsorships and/or sales.

201.     Defendant Red Sox, at all times and during the Class period supported and promoted DraftKings' MLB DFS contest for the purpose to inflate and elevate their financial stake and increased their revenues that were collected directly from participants of fantasy baseball contests, from collecting fees, promotions, advertisement, broadcastings, sponsorships and/or sales.

202.     Defendant Red Sox, at all times and during the Class period supported and promoted as MLB DFS contest for the purpose of increasing their financial share.

203.     Defendant Red Sox, at all times and during the Class period supported and promoted DraftKings' MLB DFS contest despite their knowing that it was engaged in a false, misleading and deceitful electronic stealing scheme and in violation of MLB's regulations, rules and instructions and despite that knowledge they did not disclose this scheme which was the direct and/or proximate case of the contests being tainted, corrupt, dishonest, false and/or misleading.

204.     The Plaintiff and other similarly situated members of the Class have remitted substantial money in part as fees for their membership and/or entrance and/or participating in DraftKings' MLB DFS contests.  Further Plaintiff and other similarly situated members of the

Class have remitted substantial money through broadcasting, attending, advertising, and purchasing paraphernalia.

205.    That at all times and during the Class period, Defendant Red Sox conspired to willfully and knowingly maintain their financial stake and their partnership with DraftKings due to the financial benefits that they understood would be substantial and profitable.

206.    As a direct, foreseeable and proximate cause of Defendant Red Sox' unlawful actions, the Plaintiff and other similarly situated members of the Class have been and continue to be injured from their participation in the corrupt MLB DFS contest and therefore, liable for all damages in the amount of their financial gain that arose from these transactions, which include but is not limited to the profits, benefits, fees and other financial gain and revenue that were unlawfully realized.

207.    Defendant Red Sox should be made to surrender and renounce all the profits made from the illegally and unfairly obtained revenues and proceeds and further be directed to deposit all these funds into a trust account to be set for the benefit of the Plaintiff and other situated members of the Class.

## IX.    DEMAND FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the proposed class, respectfully demands that the Court:

      a. Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. Rule 23(a) and (b)(3), direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and declare Christopher Clifford as a named representative of the Class;

b.  Conduct expedited discovery proceedings leading to a prompt trial on the merits before a jury on all claims and all defenses;

c.  Enter judgment against each of the named Defendants and in favor of Plaintiff and the Class;

d.  Award actual, compensatory, general and/or statutory damages to the Class in an amount to be determined at trial, plus interest in accordance with law;

e.  Award exemplary and/or punitive damages to the Class in an amount to be determined at trial, plus interest in accordance with law;

f.  Pursuant to the state Consumer Protection Act, award Plaintiff Christopher Clifford and the Class an appropriate injunctive and/or any equitable relief;

g.  Award the Plaintiff Christopher Clifford and the Class pre- and post-judgment interest;

h.  Award Christopher Clifford and the Class disgorgement and restitution of all proceeds, revenue, profits and accessions unlawfully received by Defendants;

i.  Award Christopher Clifford and the Class their costs of suit, including reasonable attorneys' fees as provided by law; and

j.  Award any such further and additional relief as is necessary to correct for the unlawful conduct caused and as the Court may deem just and proper under the circumstances.

## X.  JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Christopher Clifford, on behalf of himself and the proposed Class, respectfully demands a trial by jury on all issues so triable.

Dated: February 5, 2020                      Respectfully submitted,

**_/s/ John D Radice_**

John D Radice

Kenneth Pickle
Natasha Fernandez-Silber
April Lambert
RADICE LAW FIRM, P.C.
475 Wall Street
Princeton, NJ 08540
Tel: (646) 245-8502
Fax: (609) 385-0745
jradice@radicelawfirm.com
kpickle@radicelawfirm.com
nsilber@radicelawfirm.com
alambert@radicelawfirm.com

Eric L. Cramer
Patrick F. Madden
BERGER AND MONTAGUE
1818 Market Street
Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
ecramer@bm.net
pmadden@bm.net

*Counsel for Plaintiff Christopher Clifford
And the Proposed Class*