# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- x

KRISTOPHER R. OLSON,
CHRISTOPHER LOPEZ, WARREN
BARBER, CHRISTOPHER CLIFFORD
and ERIK LIPTAK,

              Plaintiffs,

      v.

MAJOR LEAGUE BASEBALL; MLB
ADVANCED MEDIA LP; HOUSTON
ASTROS, LLC; and BOSTON RED SOX
BASEBALL CLUB, LP,

              Defendants.

------------------------------------------------- x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

20 Civ. 632 (JSR)
20 Civ. 1000 (JSR)

**ORAL ARGUMENT REQUESTED**

## DEFENDANTS MAJOR LEAGUE BASEBALL AND MLB ADVANCED MEDIA LP'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS

John L. Hardiman
Benjamin R. Walker
Adam R. Brebner
Hannah Lonky Fackler
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Tel:  212-558-4000
Fax:  212-558-3558
hardimanj@sullcrom.com
walkerb@sullcrom.com
brebnera@sullcrom.com
facklerh@sullcrom.com

*Counsel for Major League Baseball and MLB Advanced Media LP*

February 21, 2020

# TABLE OF CONTENTS

*Page*

**PRELIMINARY STATEMENT** ................................................................................1

**ALLEGATIONS OF THE COMPLAINT** ..........................................................3

    A.    The Parties. ..........................................................................................3

    B.    Plaintiffs' Allegations. ........................................................................3

    C.    Plaintiffs' Claims. ...............................................................................6

**ARGUMENT** ......................................................................................................6

I.     THE AMENDED COMPLAINT DOES NOT ALLEGE ANY ACTIONABLE
      DECEPTION. .....................................................................................8

    A.    Plaintiffs Were on Notice of Rule Violations. .......................................9

    B.    Plaintiffs Do Not Allege That the Statistics Used by DraftKings Are
        Inaccurate. ........................................................................................10

    C.    Plaintiffs Point to No Misrepresentations by the MLB Defendants. .....................11

II.    PLAINTIFFS HAVE NO LEGALLY RELEVANT RELATIONSHIP WITH
      THE MLB DEFENDANTS. ...............................................................14

    A.    Without a Direct Relationship, the MLB Defendants Have No Duty to
        Plaintiffs. .........................................................................................16

    B.    Without a Direct Relationship, There Can Be No Unjust Enrichment. .................19

III.   THE AMENDED COMPLAINT DOES NOT ALLEGE ANY LEGALLY
      COGNIZABLE INJURY. ....................................................................19

    A.    Plaintiffs Have Not Alleged Any Loss From Their Participation in
        DraftKings..........................................................................................20

    B.    Plaintiffs Have Not Demonstrated a Causal Nexus. .............................21

IV.   PLAINTIFFS' CLAIMS SUFFER FROM ADDITIONAL DEFECTS............................23

    A.    Plaintiffs Cannot Assert Common Law Claims Against Major League
        Baseball..............................................................................................23

    B.    Plaintiffs' Unjust Enrichment Claim Is Barred....................................24

**CONCLUSION** ...............................................................................................**25**

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A. Terzi Prods., Inc.* v. *Theatrical Protective Union*,
   2 F. Supp. 2d 485 (S.D.N.Y. 1998) ...............................................................23

*Baleares Link Exp., S.L.* v. *GE Engine Servs.-Dallas, LP*,
   335 S.W.3d 833 (Tex. App. 2011).................................................................12

*Balles* v. *Babcock Power Inc.*,
   70 N.E.3d 905 (Mass. 2017) .....................................................................8, 21

*Barden* v. *Harpercollins Publishers, Inc.*,
   863 F. Supp. 41 (D. Mass. 1994) .................................................................17

*Barfield* v. *Hall Realty, Inc.*,
   232 P.3d 286 (Colo. App. 2010) ....................................................................9

*Bell Atl. Corp.* v. *Twombly*,
   550 U.S. 544 (2007).......................................................................................7

*Betz* v. *Blatt*,
   74 N.Y.S.3d 75 (App. Div. 2018) ................................................................12

*Bigler-Engler* v. *Breg, Inc.*,
   213 Cal. Rptr. 3d 82 (Ct. App. 2017) .....................................................17, 18

*Blake* v. *Prof'l Coin Grading Serv.*,
   898 F. Supp. 2d 365 (D. Mass. 2012) ..........................................................19

*Boca Raton Firefighters & Police Pension Fund* v. *Bahash*,
   506 F. App'x 32 (2d Cir. 2012) ...................................................................12

*Bowers* v. *Federation Internationale de l'Autombile*,
   489 F.3d 316 (7th Cir. 2007) .......................................................................15

*Castillo* v. *Tyson*,
   701 N.Y.S.2d 4235 (App. Div. 2000).............................................................15

*Cattie* v. *Wal-Mart Stores, Inc.*,
   504 F. Supp. 2d 939 (S.D. Cal. 2007)........................................................8, 23

*City of Miami* v. *Citigroup, Inc.*,
   801 F.3d 1268 (11th Cir. 2015) ...................................................................19

*City of Pontiac Policemen's & Firemen's Retirement Sys.* v. *UBS AG*,
752 F.3d 173 (2d Cir. 2014)..................................................................12

*Coppola* v. *Smith*,
935 F. Supp. 2d 993 (E.D. Cal. 2013)....................................................21

*Cruz* v. *Andrews Restoration, Inc.*,
364 S.W.3d 817 (Tex. 2012)..............................................................9, 23

*In re Daily Fantasy Sports Litig.*,
2019 WL 6337762 (D. Mass. Nov. 27, 2019) .......................................15

*Dent* v. *Dennis Pharmacy, Inc.*,
924 So. 2d 927 (Fla. Dist. Ct. App. 2006) ............................................16

*Doyle* v. *Mastercard Int'l Inc.*,
700 F. App'x 22 (2d Cir. 2017) ...............................................................8

*Fahnestock & Co. Inc.* v. *Castelazo*,
741 F. Supp. 72 (S.D.N.Y. 1990) ..........................................................17

*In re FirstMerit Bank, N.A.*,
52 S.W.3d 749 (Tex. 2001)...................................................................8–9

*Flores* v. *Bank of Am., N.A.*,
2019 WL 2470923 (D. Colo. June 13, 2019)........................................21

*FMR Corp.* v. *Boston Edison Co.*,
613 N.E.2d 902 (Mass. 1993) ...............................................................18

*In re Fyre Festival Litig.*,
399 F. Supp. 3d 203 (S.D.N.Y. 2019)...............................................17, 23

*In re Gen. Motors LLC Ignition Switch Litig.*,
407 F. Supp. 3d 212 (S.D.N.Y. 2019)....................................................21

*Gierut* v. *Morrison*,
2018 WL 6715470 (Tex. App. Dec. 21, 2018) ......................................24

*Grant Thornton LLP* v. *Prospect High Income Fund*,
314 S.W.3d 913 (Tex. 2010)..................................................................10

*Hall* v. *Humana Hosp. Daytona Beach*,
686 So. 2d 653 (Fla. Dist. Ct. App. 1996) ..............................................9

*Harris* v. *Mills*,
572 F.3d 66 (2d Cir. 2009).......................................................................7

*Herman* v. *Admit One Ticket Agency LLC*,
    912 N.E.2d 450 (Mass. 2009) ..............................................................19

*Hines* v. *Hash*,
    843 S.W.2d 464 (Tex. 1992)...................................................................8

*Hu* v. *City of New York*,
    927 F.3d 81 (2d Cir. 2019).....................................................................7

*Indian Mountain Corp.* v. *Indian Mountain Metro. Dist.*,
    412 P.3d 881 (Colo. App. 2016) ...............................................9, 19, 20

*In re Int'l Bus. Machines Corp. Sec. Litig.*,
    163 F.3d 102 (2d Cir. 1998)..................................................................13

*Ivar* v. *Elk River Partners, LLC*,
    705 F. Supp. 2d 1220 (D. Colo. 2010) .................................................21

*J.A.O. Acquisition Corp.* v. *Stavitsky*,
    863 N.E.2d 585 (N.Y. 2007).................................................................17

*Jackson* v. *Nat'l Football League*,
    1994 WL 282105 (S.D.N.Y. June 21, 1994) ........................................23

*Johnson* v. *Davis*,
    480 So. 2d 625 (Fla. 1985)...................................................................9

*Kavanagh* v. *Zwilling*,
    578 F. App'x 24 (2d Cir. 2014) .............................................................7

*Koski* v. *Carrier Corp.*,
    347 F. Supp. 3d 1185 (S.D. Fla. 2017) ................................................25

*Kwikset Corp.* v. *Superior Court*,
    246 P.3d 877 (Cal. 2011) ....................................................................21

*Land Mine Enters.* v. *Sylvester Builders, Inc.*,
    74 F. Supp. 2d 401 (S.D.N.Y. 1999).....................................................18

*Laub* v. *Faessel*,
    745 N.Y.S.2d 534 (App. Div. 2002) ....................................................22

*Le Mon* v. *Nat'l Football League*,
    277 So. 3d 1166 (La. 2019) ...........................................................15, 16

*Lee* v. *Clorox Int'l Co.*,
    466 F. App'x 826 (11th Cir. 2012) .......................................................17

*Lerner* v. *Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006)...................................................................................7

*In re Livent, Inc. Noteholders Sec. Litig.*,
    151 F. Supp. 2d 371 (S.D.N.Y. 2001).................................................................24

*Mallon Oil Co.* v. *Bowen/Edwards Assocs., Inc.*,
    965 P.2d 105 (Colo. 1998)...................................................................................17

*Mandarin Trading Ltd.* v. *Wildenstein*,
    944 N.E.2d 1104 (N.Y. 2011).........................................................................8, 11

*Martin* v. *Curran*,
    101 N.E.2d 683 (N.Y. 1951)...........................................................................23, 24

*Mayer* v. *Belichick*,
    605 F.3d 223 (3d Cir. 2010).....................................................................1, 9, 14, 15

*Melchior* v. *New Line Prods., Inc.*,
    131 Cal. Rptr. 2d 347 (Ct. App. 2003) ...............................................................24

*Mendoza* v. *City of Los Angeles*,
    78 Cal. Rptr. 2d 525 (Ct. App. 1998) .................................................................22

*N.M. by & through Lopez* v. *Trujillo*,
    397 P.3d 370 (Colo. 2017)...................................................................................16

*In re Pacquiao-Mayweather Boxing Match Pay-Per-View Litig.*,
    942 F.3d 1160 (9th Cir. 2019) ............................................................................15

*Rabin* v. *Dow Jones & Co.*,
    2014 WL 5017841 (S.D.N.Y. Sept. 23, 2014)....................................................17

*Ragone* v. *Atl. Video at Manhattan Ctr.*,
    595 F.3d 115 (2d Cir. 2010)................................................................................16

*Reed* v. *Zipcar, Inc.*,
    883 F. Supp. 2d 329 (D. Mass. 2012) .................................................................25

*Rhino Linings USA* v. *Rocky Mountain Rhino Lining, Inc.*,
    62 P.3d 142 (Colo. 2003).......................................................................................9

*Richards* v. *Direct Energy Servs., LLC*,
    915 F.3d 88 (2d Cir. 2019)....................................................................................8

*Rollins, Inc.* v. *Butland*,
    951 So. 2d 860 (Fla. Dist. Ct. App. 2006) .......................................................9, 21

*Rule* v. *Fort Dodge Animal Health, Inc.*,
    607 F.3d 250 (1st Cir. 2010) ........................................................................8

*Santagate* v. *Tower*,
    833 N.E.2d 171 (Mass. App. Ct. 2005) ......................................................9

*Shaulis* v. *Nordstrom, Inc.*,
    865 F.3d 1 (1st Cir. 2017) ..........................................................................21

*Small* v. *Fritz Cos., Inc.*,
    65 P.3d 1255 (Cal. 2003) ........................................................................8, 19

*Sterling Chemicals, Inc.* v. *Texaco, Inc.*,
    259 S.W.3d 793 (Tex. App. 2007) ..............................................................18

*Strauss* v. *Belle Realty Co.*,
    482 N.E.2d 34 (N.Y. 1985) ........................................................................16

*Thanas* v. *Royal Caribbean Cruises Ltd.*,
    2020 WL 209884 (S.D. Fla. Jan. 14, 2020) ..............................................19

*In re Tobacco II Cases*,
    207 P.3d 20 (Cal. 2009) ..........................................................................9, 23

*Walsh* v. *TelTech Sys., Inc.*,
    821 F.3d 155 (1st Cir. 2016) ......................................................................22

**Statutes**

California Consumer Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.* ..........................7–8, 23

California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ...................9, 21, 23

Colorado Consumer Protection Act, Colo. Rev. Stats. § 6-1-101 *et seq.* .................................9, 21

Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.* .......................9, 21

Massachusetts Consumer Protection Law, M.G.L. c.93A *et seq.*...........................9, 19, 21, 22, 24

Texas Deceptive Trade Practices Act,
    Tex. Bus. & Com. Code Ann. § 17.41 *et seq.*.......................................7–8, 9, 21, 23

**Other Authorities**

Fed. R. Civ. P. 9(b) ..............................................................................................................7

Fed. R. Civ. P. 12(b)(6).....................................................................................................6, 8

## PRELIMINARY STATEMENT

Plaintiffs, contestants in fantasy baseball contests organized by non-party DraftKings, filed this lawsuit in an attempt to exploit recent public allegations of "electronic sign-stealing" in violation of Major League Baseball rules during the 2017 and 2018 baseball seasons. The Amended Complaint asserts a grab bag of misfit legal theories—fraud, negligence, unjust enrichment and violation of consumer protection laws—against Major League Baseball ("MLB" or the "League") and MLB Advanced Media, L.P. ("MLBAM," and together with MLB, the "MLB Defendants"), the entity responsible for MLB's internet and interactive media operations, based on the supposed impact that this conduct had on the fantasy baseball contests in which Plaintiffs participated, even though Plaintiffs allege no relationship whatsoever between themselves and the MLB Defendants.

Plaintiffs' claims are all rooted in the fundamentally flawed premise that because MLB has a business relationship with DraftKings, fantasy baseball participants have a right to compete in contests based on player performance statistics unaffected by any violations of MLB's rules. But the DraftKings relationship does not fill the substantial gap between Plaintiffs' grievances about the conduct of professional athletes and a cognizable claim against the MLB Defendants.

*First*, Plaintiffs cannot plausibly allege that they were deceived or defrauded by the MLB Defendants because of allegedly undisclosed electronic sign-stealing. As the Third Circuit observed in affirming dismissal of similar claims relating to football's "Spygate" controversy, sports fans cannot claim ignorance of the fact "that players often commit intentional rule infractions in order to obtain an advantage over the course of the game." *Mayer* v. *Belichick*, 605 F.3d 223, 236 (3d Cir. 2010). Indeed, the Amended Complaint admits that the public was specifically on notice that electronic sign-stealing was occurring as of 2017, more than two years

before the end of the putative class period.  Plaintiffs also do not and cannot allege that there was anything inaccurate about the player performance statistics on which the outcome of their contests depended.  Plaintiffs got exactly what they bargained for: contests determined by baseball players' actual performance on the field, whatever the contributing factors, predictable or unpredictable, may have been (skill, luck, matchups, injuries, weather, umpiring, or, perhaps, rules violations). Nor have Plaintiffs alleged any actionable misrepresentations or omissions by the MLB Defendants.  To address this glaring hole in their original Complaint, Plaintiffs filed an Amended Complaint with 80 additional pages, largely devoted to blatantly misleading allegations based on selectively quoted, out-of-context statements by MLB Commissioner Robert D. Manfred, Jr.  The Court should reject Plaintiffs' attempt to save their claims by rewriting the public record.

*Second*, Plaintiffs' only alleged legal relationship was with DraftKings—a relationship that is virtually ignored by the Complaint—not MLB or MLBAM.  No legal basis exists to make the MLB Defendants guarantors of every team and player's integrity for the benefit of fantasy baseball contestants simply because the MLB Defendants do business with DraftKings. The relationship that the MLB Defendants may have with DraftKings does not create any relationship between them and any DraftKings participant nor impose on the MLB Defendants a duty to enforce the MLB rules any differently than they always have.

*Third*, and quite tellingly, Plaintiffs have not even alleged that they were actually harmed by the electronic sign-stealing rule violations.  *Not one Plaintiff* claims to have lost any fantasy baseball contest as a result of sign-stealing or otherwise.  Instead they describe their "damage" in terms of the fees they paid to participate in the fantasy contests without disclosing whether they turned a profit on their investment.  If they did win money through DraftKings fantasy contests, they have no claim under any legal theory.  And even if the upfront fees that

Plaintiffs paid to participate in DraftKings' fantasy contests could somehow be construed as a "loss" in the absence of allegations that they did not win the contests they entered (and thus lost money in the aggregate), Plaintiffs have not plausibly pled that any such loss was proximately caused by the MLB Defendants.

For these and the other reasons explained below, Plaintiffs' claims should be dismissed.

## ALLEGATIONS OF THE COMPLAINT[1]

### A.   The Parties.

Plaintiffs Olson, Lopez, Barber, Clifford and Liptak, residents of Massachusetts, California, Texas, Florida and Colorado, respectively, are participants in DraftKings daily fantasy baseball contests.  (Amended Complaint, Dkt. No. 20 ("AC") ¶¶ 121–140.)  Defendant MLB is an unincorporated association consisting of the thirty major league clubs, including defendants the Houston Astros and the Boston Red Sox.  (*Id.* ¶ 22.)  MLB administers and operates the league through the Office of the Commissioner.  (*Id.*)  Through the Major League Constitution, all thirty clubs agreed "to be bound by all rules and regulations relating to" professional baseball games and that the Commissioner has sole discretion to investigate and discipline clubs and players.  (*Id.* ¶ 44; Declaration of John L. Hardiman ("Hardiman Decl.") Ex. 1 at 1.)  Defendant MLBAM is a limited partnership owned by the thirty major league clubs with "responsibility for internet and interactive marketing for MLB, including MLB's relationship with DraftKings."  (*Id.* ¶ 23.)

### B.   Plaintiffs' Allegations.

*DraftKings Fantasy Contests.*  DraftKings is an online platform offering daily and

---

[1] The MLB Defendants dispute many of the allegations in the Amended Complaint but accept Plaintiffs' well-pled allegations as true solely for purposes of this motion.  (*See infra* at 7.)

weekly fantasy baseball contests.  (*Id.* ¶ 30.)  Participants pay DraftKings a fee for each fantasy

contest, a portion of which is kept by DraftKings and the remainder of which funds the contests'

prizes.  (*Id.* ¶ 33.)  Participants in each contest draft a "lineup" of real-life players, each assigned

a different "salary" value set by DraftKings.  (*Id.* ¶ 31).  A player's past statistical performance,

whatever the cause, is the basis for his "salary" price.  (*Id.*)  DraftKings participants accrue fantasy

points based on the real-life performance of the players they drafted during the particular day or

week covered by the particular contest, and the participants' total points at the end of the contest

determines who prevails and receives cash prizes.  (*Id.* ¶ 32.)  Plaintiffs allege that they each

participated in varying numbers of fantasy contests between April 2, 2017 and October 30, 2019,

the putative class period.  (*Id.* ¶¶ 121, 125, 129, 133, 137.)  Plaintiffs conspicuously fail to allege,

however, whether they won or lost money on the contests in which they participated.  Plaintiffs

also do not allege when they first began participating in DraftKings contests, when and what types

of contests they entered, or under what terms they participated.  Nor do Plaintiffs allege whether

they or their opponents' fantasy baseball teams included players from the Astros or Red Sox, the

teams that have been the focus of recent sign-stealing reports, or whether games played by the

Astros or Red Sox were part of the fantasy contests in which they participated.  Plaintiffs do not

even allege what representations, if any, were made to them by DraftKings.

        MLBAM "invested in an equity stake in DraftKings" and entered into "co-

branding" and sponsorship deals related to DraftKings' daily fantasy contests before the class

period began.  (*Id.* ¶¶ 35–36.)  MLBAM sold its equity interest in 2019.  (*Id.* ¶ 5.)  An article cited

in the Amended Complaint explains that MLBAM owned, at its peak, a "single-digit percentage"

in DraftKings.  (*Id.* ¶ 4 n.4.)  The Amended Complaint does not allege that MLBAM had a right

to control DraftKings or to direct DraftKings' fantasy contests, or that MLBAM undertook any

obligations to DraftKings' customers.

Plaintiffs allege that Commissioner Manfred repeatedly represented to the public that the "integrity of the game" was MLB's highest concern (*id*. ¶¶ 2, 3, 8, 38–41, 51–52), and that Plaintiffs relied on those representations in choosing to participate in DraftKings fantasy baseball contests (*id.* ¶ 209), but Plaintiffs do not allege that they relied on any statements by Commissioner Manfred, MLB or MLBAM in selecting any particular players for their fantasy lineups. Plaintiffs also allege that MLB engages in "aggressive marketing" of DraftKings' fantasy baseball contests (*id.* ¶¶ 37, 42), but they do not specify that the MLB Defendants or DraftKings said anything about MLB's statistics or MLB's rules in connection with DraftKings contests. Finally, while Plaintiffs generally allege that the MLB Defendants shared in DraftKings' profits, the allegations seem to be limited to whatever they earned as a result of MLBAM's small equity interest in DraftKings and the compensation that MLBAM received from the sponsorship deals.

***Electronic Sign-Stealing Misconduct.*** During baseball games, pitchers and catchers use a series of "signs" to communicate the "type of pitch being thrown, and the intended speed, movement, and location of the pitch" without revealing details to the player at bat. (*Id.* ¶ 57.) MLB's rules do not prohibit sign-stealing through observation by a runner on base or a base coach on the field (*id.* ¶ 85 n.37), but the rules do prohibit the use of electronic devices to steal signs (*id.* ¶ 54(a)). In 2017 and 2018, MLB further clarified the prohibition on electronic sign-stealing in memoranda issued to clubs. (*Id.* ¶ 54(b), (d).) It is undisputed that MLB sets its own rules and defines what is and is not a violation.

MLB has investigated alleged violations of its electronic sign-stealing rules and enforced them against clubs with punishments it deemed appropriate. (*Id.* ¶¶ 66, 106.) In September 2017, MLB issued a public statement announcing that it had fined the Red Sox for

using an Apple Watch to communicate a catcher's signs to the dugout, and warning teams that future electronic sign-stealing violations would be subject to serious sanctions.  (*See id.* ¶ 106.) On January 13, 2020, Commissioner Manfred issued a public statement that MLB had determined that the Houston Astros had engaged in electronic sign-stealing in violation of MLB's rules in 2017 and into the 2018 season.  (*Id.* ¶¶ 88–92.)  The Commissioner levied penalties on the Astros, including a $5 million fine on the organization, the highest permitted by the Major League Constitution, forfeiting draft selections, and suspending three members of its staff, including the team's manager and general manager, for a year.  The Office of the Commissioner is conducting an ongoing investigation into allegations against the Red Sox.

C.      **Plaintiffs' Claims.**

Plaintiffs allege that MLB knew about teams' violations of the electronic sign-stealing rules but intentionally failed to take prompt action to end them, and that all 30 of its member teams "acquiesced and ratified the Commissioner's determination not to act to stop or publicly disclose such misconduct."  (*Id.* ¶ 59; *see also id.* ¶¶ 11, 12, 61, 62, 69, 77.)  Plaintiffs also allege that "the performance statistics on which the DraftKings' MLB DFS contests were based were corrupted" by the undisclosed sign-stealing.  (*Id.* ¶ 117.)  The gravamen of the Amended Complaint is that the MLB Defendants failed in an alleged duty to prevent, investigate, remedy and disclose sign-stealing quickly enough and that they are liable to DraftKings participants for those failures under common law fraud, state consumer protection, negligence and unjust enrichment causes of action.  Plaintiffs assert without any underlying facts or logic that MLB was slow to react to the sign-stealing issues because of its relationship with DraftKings.

**ARGUMENT**

A complaint should be dismissed pursuant to Rule 12(b)(6) where, as here, it fails to state a legal claim or does not contain sufficient well-pled facts to support "a plausible

entitlement to relief." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 559 (2007).  "In deciding a Rule 12(b)(6) motion, the court may consider only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." *Hu* v. *City of New York*, 927 F.3d 81, 88 (2d Cir. 2019).  "[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to defeat a motion to dismiss.  *Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009).  A court should also "not accept as true conclusions unsupported by the facts alleged, legal conclusions, bald assertions or unwarranted inferences." *Kavanagh* v. *Zwilling*, 578 F. App'x 24, 24 (2d Cir. 2014).

Plaintiffs' fraud and consumer protection claims sounding in fraud must also comply with Rule 9(b), which mandates that such claims "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).  "[I]n order to comply with Rule 9(b), 'the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner* v. *Fleet Bank, N.A.*, 459 F.3d 273, 291 (2d Cir. 2006).  Rule 9(b) also requires plaintiffs to "allege facts that give rise to a strong inference of fraudulent intent." *Id.*

Regardless of which particular state's law applies to each of Plaintiffs' fraud, negligence, unjust enrichment and consumer protection claims, they should be dismissed.[2]  All of

---

[2] Plaintiff Lopez's statutory California Consumer Legal Remedies Act claim and Plaintiff Barber's statutory Texas Deceptive Trade Practices Act claims are also deficient because they have not complied with required notice processes.  Both statutes require private plaintiffs to give defendants notice of their claims and provide 30 and 60 days, respectively, for an opportunity to cure before

those claims share common elements, under any potentially applicable state law, requiring each Plaintiff to plead and prove some combination of a false or deceptive statement or omission by the MLB Defendants, a duty owed by the MLB Defendants to DraftKings participants, and a loss proximately caused by the MLB Defendants.  Because the Amended Complaint is deficient in all three respects, it must be dismissed.[3]

## I.   THE AMENDED COMPLAINT DOES NOT ALLEGE ANY ACTIONABLE DECEPTION.

Plaintiffs' fraud claims, state consumer protection claims sounding in fraud, and unjust enrichment claims depend on allegations that MLB and MLBAM deceived fantasy sports consumers.  *See, e.g.*, *Mandarin Trading Ltd.* v. *Wildenstein*, 944 N.E.2d 1104, 1108 (N.Y. 2011) (claim for fraud requires "a misrepresentation or a material omission of fact which was false and known to be false by the defendant");[4] *Rule* v. *Fort Dodge Animal Health, Inc.*, 607 F.3d 250, 253

---

commencing a suit for damages.  Cal. Civ. Code § 1782; Tex. Bus. & Com. Code Ann. § 17.505(c). Accordingly, Plaintiff Lopez's claim should be dismissed, *see Cattie* v. *Wal-Mart Stores, Inc.*, 504 F. Supp. 2d 939, 950 (S.D. Cal. 2007) (dismissing complaint where "Plaintiff claimed damages without giving Defendants the statutorily required opportunity for settlement"), and Plaintiff Barber's claim should be held in abeyance.  *See Hines* v. *Hash*, 843 S.W.2d 464, 468–69 (Tex. 1992) (holding "if a plaintiff files an action for damages under the DTPA without first giving the required notice, and a defendant timely requests an abatement, the trial court must abate the proceedings for 60 days").

[3] Moreover, because no Plaintiff can state a claim under his own home-state consumer protection statute, or establish entitlement to relief under state statutes other than his home-state's law, Plaintiffs do not have standing to assert claims on behalf of a putative nationwide class of DraftKings participants under the consumer protection laws of other states.  *See Richards* v. *Direct Energy Servs., LLC*, 915 F.3d 88, 105 (2d Cir. 2019) (affirming dismissal under Rule 12(b)(6) of consumer protection claims brought by out-of-state named plaintiff on behalf of in-state putative class); *Doyle* v. *Mastercard Int'l Inc.*, 700 F. App'x 22, 25 (2d Cir. 2017) (affirming dismissal of class consumer protection claim since named plaintiff "lack[ed] standing to sue on [the class's] behalf because he allege[d] no injury under that (or any other consumer protection) statute").

[4] *See also*, *e.g.*, *Balles* v. *Babcock Power Inc.*, 70 N.E.3d 905, 913 (Mass. 2017) ("The elements of fraud consist of a false representation of a matter of material fact with knowledge of its falsity."); *Small* v. *Fritz Cos., Inc.*, 65 P.3d 1255, 1258 (Cal. 2003) (same); *In re FirstMerit Bank, N.A.*, 52

(1st Cir. 2010) (Massachusetts statute prohibits "deceptive acts or practices");[5] *Hall* v. *Humana Hosp. Daytona Beach*, 686 So. 2d 653, 656 (Fla. Dist. Ct. App. 1996) (unjust enrichment "require[s] proof that the money had been paid due to" "grounds appropriate for intervention by a court of equity" including "fraud [and] misrepresentation").[6]  Because the Amended Complaint does not allege any actionable false statement, material omission (*see infra* at 17–18) or other deceptive conduct by the MLB Defendants, or allege scienter, Plaintiffs' claims fail.

### A. Plaintiffs Were on Notice of Rule Violations.

Plaintiffs' claims suffer from the same fundamental problem that has caused other courts to reject similar claims brought by disgruntled sports fans.  As the Third Circuit recognized in *Mayer* v. *Belichick*, sports fans understand "that players often commit intentional rule infractions in order to obtain an advantage over the course of the game."  605 F.3d 223, 236 (3d Cir. 2010).  Indeed, the rules themselves anticipate violations because they provide for penalties. Rules violations—large and small, intentional and unintentional, technical and game-changing— are a never-ending source of sports television, talk radio, web and elevator commentary by sports

---

S.W.3d 749, 758 (Tex. 2001) (same); *Johnson* v. *Davis*, 480 So. 2d 625, 627 (Fla. 1985) (same); *Barfield* v. *Hall Realty, Inc.*, 232 P.3d 286, 290 (Colo. App. 2010) (same).

[5] *See also*, *e.g.*, *In re Tobacco II Cases*, 207 P.3d 20, 29, 40 (Cal. 2009) (California Unfair Competition Law prohibits "fraudulent" practices where "members of the public are likely to be deceived" and actually relied upon alleged misrepresentations); *Cruz* v. *Andrews Restoration, Inc.*, 364 S.W.3d 817, 823 (Tex. 2012) (under Texas statute, "a consumer loses without proof that he relied to his detriment on the deceptive act"); *Rollins, Inc.* v. *Butland*, 951 So. 2d 860, 869 (Fla. Dist. Ct. App. 2006) (Florida statute prohibits "deceptive" acts "likely to mislead consumers"); *Rhino Linings USA* v. *Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142 (Colo. 2003) (en banc) (Colorado statute "requires that to establish a deceptive trade practice, the plaintiff must show that a defendant 'knowingly makes a false representation'").

[6] *See also Santagate* v. *Tower*, 833 N.E.2d 171, 329 (Mass. App. Ct. 2005) ("Unjust enrichment is defined as 'retention of money or property of another against the fundamental principles of justice or equity and good conscience.'"); *Indian Mountain Corp.* v. *Indian Mountain Metro. Dist.*, 412 P.3d 881, 890 (Colo. App. 2016) (unjust enrichment applies where one benefits "as a result of an unfair detriment to another").

pundits and fans alike.  And fans' general awareness of the potential for infractions is underscored

in this case by the fact that clubs were publicly disciplined for electronic sign-stealing violations

during the 2017 regular season.   Plaintiffs, however, continued to participate in DraftKings

contests (*see* AC ¶ 106), and cannot plausibly claim that DraftKings participants were deceived

into believing that rules violations would never occur.  *See, e.g.*, *Grant Thornton LLP* v. *Prospect*

*High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010) ("a person may not justifiably rely on a

representation if there are 'red flags'").

> ### B.   Plaintiffs Do Not Allege That the Statistics Used by DraftKings Are Inaccurate.

Plaintiffs assert that the player statistics that determined the outcome of their

DraftKings fantasy contests were "distorted by cheating" (AC ¶ 10), and that sign-stealing

"corrupt[ed] the accuracy" of those statistics because it gave certain players an unfair advantage.

(*Id.* ¶ 195.)  But nowhere do Plaintiffs allege that players' statistics inaccurately reflected their

real-life performance or actual events that took place on the field, or that DraftKings scored their

fantasy baseball contests based on events that did not occur.  A Major League player's statistical

performance is affected by a myriad of factors beyond his skills, including illness, injury, weather,

umpiring, luck, fan interference, field conditions, and hot (or cold) streaks, among other things.

Regrettably, rules violations can affect performance as well.   Whatever factors impact what

happens on the field, they are reflected in the statistics to which all fantasy participants have access

in making their lineup decisions.  And the success or failure of a given fantasy participant in a

given fantasy contest is determined by the same statistics as their fantasy opponents.  Because

Plaintiffs cannot dispute that the statistics used in drafting their fantasy baseball teams (and

deciding the outcome of their contests) accurately reflected real-life performance, they cannot

establish that the statistics themselves are actionable "false" misrepresentations or amount to a

"deceptive" practice by MLB.  *See, e.g.*, *Mandarin Trading*, 944 N.E.2d at 1108.

### C.      Plaintiffs Point to No Misrepresentations by the MLB Defendants.

Critically, despite adding 370 paragraphs of allegations to the Amended Complaint, Plaintiffs point to no actionable statements by Commissioner Manfred or anyone else affiliated with the MLB Defendants that amount to a false promise to DraftKings participants by the League that, because it had a sponsorship relationship with DraftKings, the baseball underlying their fantasy contests would be something different than baseball as it always has been but rather a different form of the game, bereft of any rule violations.  Nor do Plaintiffs plausibly allege that the *DraftKings relationship* deterred MLB from rooting out and punishing rules violations or provided a motive to hide sign-stealing.  Accordingly, Plaintiffs have failed to allege a material misrepresentation or scienter, or any other "deceptive" practice, as required to state fraud and fraud-based consumer protection claims.  *See, e.g.*, *Mandarin Trading*, 944 N.E.2d at 1108.

Plaintiffs take Commissioner Manfred's statements about "integrity" out of context to make it appear as if he represented to the public that the League enforced its rules for the benefit of fantasy sports participants.  However, many of the statements cited in the Amended Complaint in fact relate to efforts to shape legal regulations around sports betting in the wake of the Supreme Court's 2018 decision in *Murphy* v. *NCAA*, 138 S. Ct. 1461 (U.S. 2018).  (*See* AC ¶¶ 1–3, 8, 38–41, 51–53, 65–67; Hardiman Decl. Exs. 2–10.)  These statements all reflect the League's concern that, left unregulated, gambling could affect the "integrity" of major league games (*i.e.*, that players could be corrupted into throwing games to benefit gamblers, like the Black Sox).  None reflects Plaintiffs' inverse proposition that cheating by players or teams could affect gamblers or fantasy sports participants.  The remainder of Commissioner Manfred's statements regarding "integrity" focused on by the Amended Complaint do relate to fantasy sports but not the "fairness" of the real-life games underlying the fantasy contests.  Rather, they reflect the League's concern that fantasy

sports games themselves might be unfair because, for example, employees of fantasy sports operators might misuse insider data to manipulate fantasy contests.  (*See* AC ¶¶ 8 n.9, 39; Hardiman Decl. Ex. 5.)[7]

        The Amended Complaint also cites to a few statements by the League about its sign-stealing rules, but those statements were unrelated to fantasy sports in general or DraftKings in particular, and none is a guarantee by MLB that it would enforce those rules in any particular way or on any particular timeline.  Specifically, the Amended Complaint sets out multiple statements from the Office of the Commissioner regarding the electronic sign-stealing regulations issued in 2017 and 2018.  (*See* AC ¶ 54.)  Plaintiffs point to nothing in any of those statements that was false in any way.  Moreover, because these statements were directed to clubs, not to DraftKings participants, Plaintiffs cannot allege that MLB made the statements with the requisite scienter and intended for Plaintiffs to rely on them.  *See, e.g.*, *Betz* v. *Blatt*, 74 N.Y.S.3d 75, 81 (App. Div. 2018) (fraud requires that defendant "knew the representations were false and made them with intent to induce reliance *by the plaintiff*") (emphasis added); *Baleares Link Exp., S.L.* v. *GE Engine Servs.-Dallas, LP*, 335 S.W.3d 833, 840 (Tex. App. 2011) ("proof of intent to induce reliance requires proof that the defendant knew . . . that the *particular* plaintiff would rely on the defendant's representations").  In fact, to the extent that any DraftKings participants were even exposed to these statements (which Plaintiffs do not allege), they alerted DraftKings participants that electronic sign-stealing was an issue of concern, not that it had been eradicated.  And,

---

[7] Even if Plaintiffs' description of Commissioner Manfred's statements was accurate, "[i]t is well-established that general statements about . . . integrity" are "too general" to be material misrepresentations.  *City of Pontiac Policemen's & Firemen's Retirement Sys.* v. *UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014); *see also, e.g.*, *Boca Raton Firefighters & Police Pension Fund* v. *Bahash*, 506 F. App'x 32, 37 (2d Cir. 2012) (statements about "integrity and credibility" not actionable misrepresentations).

critically, Plaintiffs point to nothing connecting statements about the electronic sign-stealing rules to fantasy sports.

Plaintiffs also selectively quote from an October 17, 2018 MLB public statement that uses the term "thorough investigation" and relates to the Astros and electronic sign-stealing to suggest that MLB told the public that it had addressed the sign-stealing problem that was the subject of MLB's investigation in 2020.  (AC ¶¶ 64–67; Hardiman Decl. Ex. 10.)  This is quite disingenuous; the 2018 statement had nothing to do with the electronic sign-stealing that was the focus of the 2020 Astros penalties but rather something different, *i.e.*, that an Astros employee was photographing the Red Sox's dugout before one playoff game.  Nothing in the Amended Complaint supports the conclusion that the actual October 2018 statement was false or that MLB ever represented anything about the Astros behavior that was punished in 2020.  And, again, Plaintiffs point to nothing connecting the League's statement in October 2018 to fantasy sports.

Thus, no statement alleged in the Amended Complaint during the putative class period[8] supports Plaintiffs' theory that MLB's statements about the League's "integrity" or its rules and regulations proscribing electronic sign-stealing were false, that MLB knew those statements were false, and that MLB intended them to induce fantasy players to participate in DraftKings.[9]  Without alleging any actionable misrepresentations by MLB or MLBAM,[10]

---

[8] In addition, to the extent Plaintiffs allege statements by the Commissioner made after the purported class period ended on October 30, 2019 were false (*see* AC ¶¶ 88–89), they cannot form the basis for any claim in this case.  *See In re Int'l Bus. Machines Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) ("A defendant, however, is liable only for those statements made during the class period.").

[9] To the extent Plaintiffs allege "deception" or "misrepresentation" by omission, that theory fails as a matter of law because they cannot establish a duty to disclose.  (*See infra* at 17–18.)

[10] Nowhere does the Amended Complaint allege any purported misstatements by MLBAM; nor does it allege that MLBAM had any involvement in the enforcement of MLB's rules or had any knowledge of sign-stealing misconduct.  Further, to the extent that Plaintiffs purport to claim that

Plaintiffs have failed to plead an essential element of their common law fraud claim, failed to allege a "deceptive" practice under any state's consumer protection statute, and failed to state an unjust enrichment claim.  Accordingly, these claims should be dismissed.

## II.   PLAINTIFFS HAVE NO LEGALLY RELEVANT RELATIONSHIP WITH THE MLB DEFENDANTS.

Plaintiffs' attenuated relationship to MLBAM and, in turn, MLB, through their participation in DraftKings' contests does not give rise to any rights against Defendants under any of Plaintiffs' theories of liability.

As a threshold matter, sports fans in general have no "legally cognizable right, interest, or injury" to recover for violations of a professional sports league's rules.  *Mayer*, 605 F.3d at 230.  "[I]t is not the role of judges and juries to be second-guessing the decision taken by a professional sports league purportedly enforcing its *own* rules."  *Id.* at 237 (emphasis original). In *Mayer*, a New York Jets season ticketholder sought to sue the National Football League, the New England Patriots and coach Bill Belichick on claims arising from "Spygate," wherein Patriots staff "surreptitiously videotape[d] the New York Jets coaches and players on the field with the purpose of illegally recording, capturing and stealing the New York Jets signals and visual coaching instructions" in violation of NFL rules.  *Id.* at 225.  The Third Circuit concluded that, as a fan and ticketholder, the plaintiff had no cognizable right or injury because, "[a]t best, he possessed nothing more than a contractual right to a seat from which to watch an NFL game between the Jets and Patriots, and this right was clearly honored."  *Id.* at 230.  The court held that, even assuming the plaintiff was a "victim" of "a team's ongoing acts of dishonesty or cheating in violation of the express rules of the game," he did not have any legal claims against the league.

---

the MLB Defendants are liable for any alleged misstatements by the Astros or Red Sox, the Amended Complaint alleges no facts that would support such a theory.

*Id.* at 236.

   Other courts agree that ticketholders have no actionable right to sue when they are "disappointed by a sporting event," whether because an athlete did not disclose an injury before competition, *In re Pacquiao-Mayweather Boxing Match Pay-Per-View Litig.*, 942 F.3d 1160 (9th Cir. 2019); referees miss a penalty call, *Le Mon* v. *Nat'l Football League*, 277 So.3d 1166 (La. 2019); some competitors failed to show on race day, *Bowers* v. *Federation Internationale de l'Automobile*, 489 F.3d 316 (7th Cir. 2007); or a match ends in disqualification, *Castillo* v. *Tyson*, 701 N.Y.S.2d 423, 424–25 (App. Div. 2000).  This universally applied rule makes eminent sense; without it, professional sports would generate a quagmire of litigation, with the courts turned into replay booths.  As the Third Circuit recognized in *Mayer*:

> At the very least, a ruling in favor of Mayer could lead to other disappointed fans filing lawsuits because of "a blown call" that apparently caused their team to lose or any number of allegedly improper acts committed by the teams, coaches, players, referees and umpires, and others.  This Court refuses to countenance a course of action that would only further burden already limited judicial resources and force professional sports organizations and related individuals to expend money, time, and resources to defend against such litigation.

605 F.3d at 237.

   Here, Plaintiffs are not even in the position of ticketholders with a direct relationship with MLB or MLBAM; their claims purportedly arise from their relationship with DraftKings.[11]  And without a direct relationship between Plaintiffs and MLB or MLBAM, there is

---

[11] Plaintiffs conspicuously fail to allege any details about their legal relationship with DraftKings. This is likely because it appears that DraftKings' "Terms of Use" is an enforceable agreement requiring mandatory arbitration of claims arising from the use of its platform.  *See In re Daily Fantasy Sports Litig.*, 2019 WL 6337762 (D. Mass. Nov. 27, 2019) (applying arbitration clause in DraftKings' Terms of Use).  Plaintiffs cannot have it both ways.  If they are correct that their relationship with DraftKings gives rise to claims against the MLB Defendants, the MLB Defendants are entitled to enforce the DraftKings arbitration agreement through the doctrine of

no duty of care that could support a negligence claim, no duty to disclose that could support a fraud-based claim, and no direct exchange that could support an unjust enrichment claim.

### A.   Without a Direct Relationship, the MLB Defendants Have No Duty to Plaintiffs.

Plaintiffs posit that the MLB Defendants owe DraftKings participants two legal duties: a duty to enforce the League's own rules to fans' satisfaction, and a duty to warn fans that its own rules might have been violated.  (*See, e.g.*, AC ¶¶ 195–96.)  But the law imposes neither duty where there is no direct relationship between the parties.  MLBAM's former equity interest in, and sponsorship agreements with, DraftKings do not alter this calculus.  Plaintiffs do not allege that the MLB Defendants controlled DraftKings by virtue of the equity interest; nor do they allege that the MLB Defendants were promoting DraftKings pursuant to the sponsorship agreements as anything other than fantasy contests based on whatever happens in real-life games of baseball.

In the absence of a direct relationship, the MLB Defendants did not owe Plaintiffs a generalized "duty of care" that could support a negligence claim.  "It is . . .  the responsibility of the courts" to "fix[] the orbit of duty" in "the absence of privity" "to limit the legal consequences of wrongs to a controllable degree. . .  and to protect against crushing exposure to liability."  *Strauss* v. *Belle Realty Co.*, 482 N.E.2d 34, 36 (N.Y. 1985).[12]  This is especially true where "public policy considerations weigh in favor of restricting the rights of spectators to bring actions based on the conduct of officials of professional sporting leagues."  *Le Mon*, 277 So.3d at 1168.

---

equitable estoppel.  *See, e.g.*, *Ragone* v. *Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 126–27 (2d Cir. 2010).  Accordingly, the MLB Defendants reserve their right to move to compel arbitration if any of Plaintiffs' claims survive this motion.

[12] *See also, e.g.*, *Dent* v. *Dennis Pharmacy, Inc.*, 924 So.2d 927, 929 (Fla. Dist. Ct. App. 2006) (in considering whether to impose duty to "unidentifiable third parties" court should avoid "creat[ing] a zone of risk which would be impossible to define"); *N.M. by & through Lopez* v. *Trujillo*, 397 P.3d 370, 374 (Colo. 2017) (where negligence claim "based on a defendant's failure to act," existence of duty "predicated on a definite relation between the parties").

The lack of a direct relationship also precludes imposing on the MLB Defendants a duty to disclose potential rules violations to DraftKings participants under either a fraudulent omission or negligence theory.  MLB's alleged "[u]nique and superior knowledge" of potential player or team misconduct "does not create an affirmative duty" to warn DraftKings' customers under negligence law, *In re Fyre Festival Litig.*, 399 F. Supp. 3d 203, 220 (S.D.N.Y. 2019) (New York law), because "absent a special relationship there is no general duty to warn others of a foreseeable risk of harm even if one has knowledge of a risk that exists." *Fahnestock & Co. Inc.* v. *Castelazo*, 741 F. Supp. 72, 76 (S.D.N.Y. 1990) (New York law); *see also Lee* v. *Clorox Int'l Co.*, 466 F. App'x 826, 829 (11th Cir. 2012) (in Florida, only a "special relationship" may give rise to "a duty to warn").[13]  Viewed through the lens of a fraudulent omission theory of liability, a defendant can have a duty to disclose only where there is a "fiduciary relationship" or a transaction arising "from direct dealings between the plaintiff and the defendant." *Bigler-Engler* v. *Breg, Inc.*, 213 Cal. Rptr. 3d 82, 113 (Ct. App. 2017); *see also, e.g.*, *Mallon Oil Co.* v. *Bowen/Edwards Assocs., Inc.*, 965 P.2d 105, 111 (Colo. 1998) (en banc) ("defendant has a duty to a plaintiff with whom he or she deals . . .").[14]  Here, Plaintiffs allege neither of these circumstances.  There is no basis to find any relationship between the MLB Defendants and DraftKings participants, much

---

[13] "Special relationships in this context have previously been relegated to quite narrow settings." *Rabin* v. *Dow Jones & Co.*, 2014 WL 5017841, at *2 (S.D.N.Y. Sept. 23, 2014) (Rakoff, J.); *see also Fahnestock*, 741 F. Supp. at 76 ("special relationship[s]" include "employers and employees, owners and occupiers of premises, common carriers and their patrons, and hosts who serve alcoholic beverages to their guests.").

[14] The same would be true if Plaintiffs' claims are viewed through the lens of a negligent misrepresentation theory.  A plaintiff must, among other things, plead and prove "the existence of a special or privity-like relationship imposing a duty on the defendant to impact correct information to the plaintiff" to make out a negligent misrepresentation claim. *J.A.O. Acquisition Corp.* v. *Stavitsky*, 863 N.E.2d 585, 587 (N.Y. 2007); *see also, e.g.*, *Barden* v. *Harpercollins Publishers, Inc.*, 863 F. Supp. 41, 43–44 (D. Mass. 1994) ("to prevail on a negligent misrepresentation claim . . .  a plaintiff must prove privity between the parties" or that "defendant had knowledge of its actual reliance").

less a fiduciary relationship.  The interactions giving rise to Plaintiffs' participation in DraftKings

fantasy contests were with *DraftKings*, not with MLB or MLBAM, and Plaintiffs have not alleged

*any* "transaction" directly between Plaintiffs and the MLB Defendants.  *Bigler-Engler*, 213 Cal.

Rptr. 3d at 113.

    Without a direct relationship, Plaintiffs' negligence claims are barred for the

independent reason that, to the extent they allege any loss at all, they allege only monetary harm,

and "it is well established under New York law that, where a plaintiff alleges only economic

damages resulting from a defendant's alleged negligence, defendants owe no duty to plaintiffs with

whom they are not in contractual privity." *Land Mine Enters.* v. *Sylvester Builders, Inc.*, 74 F.

Supp. 2d 401, 407 (S.D.N.Y. 1999) (citing *Eaves Brooks Costume Co.* v. *Y.B.H. Realty Corp.*, 556

N.E.2d 1093) (N.Y. 1990)), *aff'd* 234 F.3d 1262 (2d Cir. 2000); *see also, e.g.*, *FMR Corp.* v.

*Boston Edison Co.*, 613 N.E.2d 902, 903 (Mass. 1993) ("purely economic losses are unrecoverable

in tort . . . in the absence of personal injury or property damage"); *Sterling Chemicals, Inc.* v.

*Texaco, Inc.*, 259 S.W.3d 793, 799 (Tex. App. 2007) ("Texas state courts have consistently applied

the economic loss rule to negligence claims between parties who were not in privity.").

    Moreover, carried to its logical extreme, Plaintiffs' theory that the MLB Defendants

had a duty to disclose electronic sign-stealing allegations would require the MLB Defendants to

immediately share with fantasy participants *any* information that could potentially affect a player's

performance, including all undisclosed injuries, coaching decisions, or details of players' personal

lives.  As other courts have recognized, that is not and should not be the law.  (*See supra* at 14–

15.)

    Thus, because Plaintiffs have not alleged a direct relationship between DraftKings

participants and either MLB or MLBAM, Defendants have no legal duty to DraftKings participants

(including Plaintiffs) that could form the basis for liability.  Plaintiffs' negligence and fraud by omission claims should be dismissed.

> **B.    Without a Direct Relationship, There Can Be No Unjust Enrichment.**

Similarly, Plaintiffs' relationship with MLB and MLBAM is too attenuated to support an unjust enrichment claim under any state's law that recognizes such claims.  Plaintiffs have not alleged a benefit conferred by them upon MLB or MLBAM, rather than upon DraftKings. Unjust enrichment requires a more direct exchange.  *See Blake* v. *Prof'l Coin Grading Serv.*, 898 F. Supp. 2d 365, 390 (D. Mass. 2012) (Massachusetts bars unjust enrichment claims where the plaintiff "does not allege that he directly conferred the benefit" upon a defendant).[15]   Accordingly, Plaintiffs' unjust enrichment claims should be dismissed.

## III.   THE AMENDED COMPLAINT DOES NOT ALLEGE ANY LEGALLY COGNIZABLE INJURY.

All of Plaintiffs' claims, under any applicable law, require Plaintiffs to plead and prove that they suffered losses proximately caused by the MLB Defendants' actions.  *See, e.g.*, *Small*, 65 P.3d at 1258 (under California law, fraud requires "justifiable reliance" and "resulting damage"); *Thanas* v. *Royal Caribbean Cruises Ltd.*, 2020 WL 209884, at *2 (S.D. Fla. Jan. 14, 2020) (negligence requires a showing that the defendant's "breach actually and proximately caused the plaintiff's injury[,] and the plaintiff suffered actual harm"); *Herman* v. *Admit One Ticket Agency LLC*, 912 N.E.2d 450, 454 (Mass. 2009) (Massachusetts statute requires "a causal connection between the injury suffered and the defendant's unfair or deceptive method, act, or

---

[15] *See also, e.g.*, *City of Miami* v. *Citigroup, Inc.*, 801 F.3d 1268, 1277–78 (11th Cir. 2015) (affirming dismissal because "unjust enrichment claim under Florida law" requires "a benefit conferred directly on" the defendant); *Indian Mountain*, 412 P.3d at 890 ("privity or direct personal dealings required for . . . unjust enrichment" under Colorado law) (citing *Mitchell* v. *Tex. Gulf Sulphur Co.*, 446 F.2d 90, 105 (10th Cir. 1971)).

practice"); *Indian Mountain*, 412 P.3d at 890 (Colorado unjust enrichment applies where one benefits "as a result of an unfair detriment to another"). Plaintiffs have not alleged that they lost money on their DraftKings contests. Moreover, even if they had, Plaintiffs have not plausibly pled that those losses were proximately caused by the MLB Defendants.

### A. Plaintiffs Have Not Alleged Any Loss From Their Participation in DraftKings.

Each Plaintiff alleges only that he "would not have entered into DraftKings MLB DFS contests" if he had known about electronic sign-stealing. (AC ¶¶ 121–140.)[16] One would have thought that if any Plaintiff had ultimately lost money as a result of participating in DraftKings contests then they would have alleged that as well, but none do, leading to the very real possibility that they each might actually have *made* money on the contests. In an event, regardless of whether Plaintiffs won or lost money in the aggregate, they cannot plausibly allege that they suffered a loss as a result of their participation in DraftKings fantasy contests because they got what they paid for: participation in fantasy baseball contests determined by what happened on the field. For example, Plaintiffs do not allege that they paid entrance fees to DraftKings for fantasy contests that never took place. Moreover, while Plaintiffs conclusorily allege that fantasy baseball participants are more "involved" as fans and that MLB has benefitted from "increased advertising and television revenues, and increased sales of MLB paraphernalia" because of its relationship with DraftKings (*id.* ¶ 119), no Plaintiff alleges that he personally spent "increased" money on game tickets or merchandise because of his participation in fantasy baseball contests

---

[16] In their "Class Allegations," Plaintiffs do generally allege that they "have lost significant amounts individually" (*see id.* ¶ 161), but that conclusory allegation needs to be viewed in the context of their Amended Complaint as a whole, where the only "loss" described is the money Plaintiffs paid upfront for the opportunity to win cash prizes in the contests they entered. (*Id.* ¶¶ 121–140.)

during the class period.

Injury is a necessary element for both common law fraud and negligence claims and failure to allege losses precludes recovery.[17]  Similarly, state consumer protection statutes require a plaintiff to plead and prove an actual loss.[18]  Plaintiffs' assertions that they and other putative class members would not have participated in DraftKings had they known about sign-stealing fails to establish such a loss.  As for Plaintiffs' unjust enrichment claims, Plaintiffs have not alleged any recoverable loss for the additional reason that they have not alleged that they conferred any unwarranted "benefit" on MLB or MLBAM by paying *DraftKings* for their fantasy baseball contests.[19]  (*See supra* at 19.)

## B.   Plaintiffs Have Not Demonstrated a Causal Nexus.

Even if Plaintiffs had adequately pled deception by the MLB Defendants, a duty

---

[17] *See, e.g.*, *Balles*, 70 N.E.3d at 913 ("damage" to plaintiff is "necessary element[] of fraud"); *Coppola* v. *Smith*, 935 F. Supp. 2d 993, 1013 (E.D. Cal. 2013) ("The elements of actionable negligence are: (1) a legal duty to use due care; (2) a breach of that duty; (3) causation; and (4) damages.").

[18] *See, e.g.*, *Shaulis* v. *Nordstrom, Inc.*, 865 F.3d 1, 10 (1st Cir. 2017) ("Massachusetts courts decline[] to find injury under Chapter 93A where the plaintiff relies entirely on her subjective belief of the value received" and her claims are not "grounded in any objective measure"); *In re Gen. Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212, 229–30 (S.D.N.Y. 2019) (in Texas consumer claim, "Texas courts distinguish between the subjective value of a defective [product] to its buyer and its objective market value, which is the appropriate focus of a benefit-of-the-bargain damages calculation"); *Rollins*, 951 So. 2d at 869 ("[Florida statute] does not provide for the recovery of nominal damages, speculative losses, or compensation for subjective feelings of disappointment").  The consumer protection laws of California and Colorado permit plaintiffs to allege an injury where they would not have bought a product but for the defendant's deception, *see, e.g.*, *Kwikset Corp.* v. *Superior Court*, 246 P.3d 877, 881 (Cal. 2011); *Ivar* v. *Elk River Partners, LLC*, 705 F. Supp. 2d 1220, 1241 (D. Colo. 2010), but still do not permit a consumer to recover unless they have "lost money or property," *Kwikset*, 246 P.3d at 881.  Here, where the "product" Plaintiffs purchased amounts to an opportunity to make or lose money based on the outcome of a fantasy baseball contest, they cannot plausibly claim that they were injured if they do not even allege that they lost.

[19] *See, e.g.*, *Flores* v. *Bank of Am., N.A.*, 2019 WL 2470923, at *16 (D. Colo. June 13, 2019) (dismissing unjust enrichment claim where plaintiff "receiv[ed] services in exchange for money").

owed by the MLB Defendants to DraftKings participants, and losses, all of Plaintiffs' claims would still be subject to dismissal because they have not alleged that any statement by MLB or MLBAM about the League's rules actually caused them to participate in, and win or lose money on, DraftKings fantasy contests. *See, e.g.*, *Laub* v. *Faessel*, 745 N.Y.S.2d 534, 536 (App. Div. 2002) (for fraud claim "plaintiff must establish that the alleged misrepresentations . . . were the direct and proximate causes of the losses claimed"); *Mendoza* v. *City of Los Angeles*, 78 Cal. Rptr. 2d 525, 528 (Ct. App. 1998) (negligence requires "proximate cause between the breach and the plaintiff's injury"); *Walsh* v. *TelTech Sys., Inc.*, 821 F.3d 155, 160 (1st Cir. 2016) ("A plaintiff's failure to establish both factual and proximate causation is fatal to her [Massachusetts statute] claim.").

Plaintiffs' conclusory allegations of causation are insufficient to tie MLB's statements about its rules or about DraftKings to any losses suffered in DraftKings fantasy baseball contests. Plaintiffs do not allege that they selected particular players for their lineup on the basis of any representation by MLB or MLBAM. Plaintiffs do not even allege whether their or their opponents' fantasy lineups included players from the Astros or Red Sox, or even whether Astros or Red Sox games were part of the fantasy contests in which they participated.[20] Moreover, the Amended Complaint wholly ignores the complex web of factors that could have affected the performance of Plaintiffs' fantasy baseball lineups compared to those of their competitors—not only all of the hidden factors behind a player's performance statistics (*see supra* at 10), but the countless idiosyncratic reasons other DraftKings participants choose *their* lineups.

---

[20] Likewise, Plaintiffs do not allege that MLB or MLBAM had any control over the DraftKings platform or DraftKings contests. To the contrary, it is DraftKings that sets the fees Plaintiffs paid, DraftKings that sets the algorithm that determines players' "salaries," and DraftKings that sets the terms under which fantasy contests operate—and there are no allegations in the Amended Complaint to the contrary.

Plaintiffs also have not plausibly pled that they actually relied on any alleged misstatement, a required element of their fraud and fraud-based consumer protection claims. Plaintiffs' statements of reliance are conclusory and generalized to all alleged misstatements and omissions; they do not allege "that any plaintiff saw, read, or otherwise noticed" any specific alleged misrepresentation from the Office of the Commissioner about the League's rules or the "integrity" of the game and thus "there is no allegation that there was 'actual reliance' at all." *In re Fyre Festival Litig.*, 399 F. Supp. 3d at 216–17.[21]

## IV.   PLAINTIFFS' CLAIMS SUFFER FROM ADDITIONAL DEFECTS.

### A.   Plaintiffs Cannot Assert Common Law Claims Against Major League Baseball.

As stated above, MLB is an unincorporated association and the Office of the Commissioner of Baseball is headquartered in New York City.  Under the New York Court of Appeals decision in *Martin* v. *Curran*, 101 N.E.2d 683 (N.Y. 1951), an unincorporated association's liability, "whether for breaches of agreements or tortious wrongs, [is] limited to cases in which the individual liability of *every single member* can be alleged and proven."  *Id.* at 686 (emphasis added).   The *Martin* rule mandates dismissal of common law claims against unincorporated professional sports leagues in the absence of allegations that wrongful acts "were either authorized or ratified by the other member teams."  *Jackson* v. *Nat'l Football League*, 1994 WL 282105, at *5 (S.D.N.Y. June 21, 1994); *see also A. Terzi Prods., Inc.* v. *Theatrical Protective Union*, 2 F. Supp. 2d 485, 492 (S.D.N.Y. 1998) (Sotomayor, D.J.) (dismissing claims where

---

[21] *See also*, *e.g.*, *In re Tobacco II*, 207 P.3d at 26 ("[A] class representative proceeding on a claim of misrepresentation as the basis of his or her [California Unfair Competition Law] action must demonstrate actual reliance on the allegedly deceptive or misleading statements."); *Cattie*, 504 F. Supp. 2d at 946 ("California requires a plaintiff suing under the [Consumer Legal Remedies Act] for misrepresentations in connection with a sale to plead and prove she relied on a material misrepresentation."); *Cruz*, 364 S.W.3d at 823 (under Texas statute, "a consumer loses without proof that he relied to his detriment on the deceptive act").

"plaintiffs have not alleged that [the association's] members had any knowledge, let alone 'full knowledge,' of the allegedly tortious conduct . . .  [y]et this is precisely what plaintiffs need to allege to meet *Martin*'s stringent ratification requirement").

Plaintiffs' transparent attempt to plead around the *Martin* rule—by alleging that all thirty clubs "ratified and approved" electronic sign-stealing by their opponents (AC ¶ 12)—should be rejected.  That allegation is absurd.  Competitors obviously do not want their opponents to cheat. Indeed, Plaintiffs' theory is directly contradicted by other allegations in the Amended Complaint that clubs *complained* about other teams' potential rules violations.  (*Compare* AC ¶ 62 ("MLB's member Clubs acquiesced and ratified the Commissioner's determination to, in effect, turn a blind eye to the ongoing electronic sign stealing misconduct") *with id.* ¶¶ 63–68 (detailing complaints by "a number of teams" of alleged electronic sign-stealing).  The Court need not accept these "conflicted pleadings that make no sense" and that "are contradicted [both] by statements in the complaint itself or by documents upon which its pleadings rely."  *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405 (S.D.N.Y. 2001).

**B.    Plaintiffs' Unjust Enrichment Claim Is Barred.**

Unjust enrichment is not an independent cause of action under either California or Texas law.  *See Melchior* v. *New Line Prods., Inc.*, 131 Cal. Rptr. 2d 347, 357 (Ct. App. 2003) ("[T]here is no cause of action in California for unjust enrichment."); *Gierut* v . *Morrison*, 2018 WL 6715470, at *6 (Tex. App. Dec. 21, 2018) ("Unjust enrichment is a measure of damages, not a cause of action.").  Thus, to the extent Plaintiffs' unjust enrichment claims against the MLB Defendants are governed by California or Texas law, they plainly should be dismissed.

The claims also should be dismissed even if the law of another state or states applies, as no other potentially applicable state law permits a plaintiff to pursue an unjust enrichment claim, an equitable remedy, when there is an adequate remedy at law, even if the

-24-

plaintiff's legal claims are themselves deficient.  *See, e.g.*, *Reed* v. *Zipcar, Inc.*, 883 F. Supp. 2d 329, 334 (D. Mass. 2012) ("The viability of [plaintiff's consumer statute] claim . . .  is beside the point; its 'mere availability' bars her claims for unjust enrichment."), *aff'd* 527 F. App'x 20 (1st Cir. 2013); *Koski* v. *Carrier Corp.*, 347 F. Supp. 3d 1185, 1196 (S.D. Fla. 2017) (plaintiff cannot plead "alternative" unjust enrichment and legal claims "where the unjust enrichment claim relies upon the same factual predicates as a plaintiff's legal causes of action" and dismissing consumer statute, unjust enrichment and fraudulent concealment claims).  Here, Plaintiff's unjust enrichment claims arise out of the same conduct as their legal claims and thus are barred.

## CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed.[22]

Dated: February 21, 2020                           Respectfully submitted,

*/s/ John L. Hardiman*
John L. Hardiman
Benjamin R. Walker
Adam R. Brebner
Hannah Lonky Fackler
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Tel:  212-558-4000
Fax:  212-558-3558
hardimanj@sullcrom.com
walkerb@sullcrom.com
brebnera@sullcrom.com
facklerh@sullcrom.com

*Counsel for Major League Baseball and MLB Advanced Media LP*

---

[22] To the extent that the complaint in *Clifford* v. *Major League Baseball, et al.* (20 Civ. 1000) remains operative despite Clifford joining the Amended Complaint in this case, it should be dismissed for the same reasons.