UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KRISTOPHER R. OLSON, CHRISTOPHER LOPEZ, WARREN BARBER, CHRISTOPHER CLIFFORD, AND ERIK LIPTAK, individually and on behalf of all others similarly situated, <br><br>             Plaintiffs, <br><br>     v. <br><br> MAJOR LEAGUE BASEBALL; MLB ADVANCED MEDIA, L.P.; HOUSTON ASTROS, LLC; and BOSTON RED SOX BASEBALL CLUB, L.P., <br><br>             Defendants. | 20-cv-632 (JSR) <br><br><br> OPINION AND ORDER |

JED S. RAKOFF, U.S.D.J.

A sport that celebrates "stealing," even if only of a base, may not provide the perfect encouragement to scrupulous play. Nor can it be denied that an overweening desire to win may sometimes lead our heroes to employ forbidden substances on their (spit) balls, their (corked) bats, or even their (steroid-consuming) selves. But as Frank Sinatra famously said to Grace Kelly (in the 1956 movie musical <u>High Society</u>), "there are rules about such things."[1]

---

[1] Frank was referring, of course, to a different kind of sport. The words were first uttered by Van Heflin to Katherine Hepburn

1

One of these rules forbids the use of electronic devices in aid of the players' inevitable efforts to steal the opposing catcher's signs. In 2017 and thereafter, the Houston Astros, and somewhat less blatantly the Boston Red Sox, shamelessly broke that rule, and thereby broke the hearts of all true baseball fans. But did the initial efforts of those teams, and supposedly of Major League Baseball itself, to conceal these foul deeds from the simple sports bettors who wagered on fantasy baseball create a cognizable legal claim? On the allegations here made, the answer is no.

## I. Background

This is a putative class action brought by fantasy sports players against defendants Major League Baseball and MLB Advanced Media, L.P. (collectively "MLB"), the Boston Red Sox Baseball Club, L.P. (the "Red Sox"), and the Houston Astros, LLC (the "Astros"). The named plaintiffs are five individuals who, between 2017 and 2019, participated in daily fantasy baseball contests hosted by DraftKings Inc. ("DraftKings"). Plaintiffs assert various fraud, negligence, unjust enrichment, and consumer protection law claims based on alleged harm caused by the

─────────────

in the play <u>The Philadelphia Story</u> (1939) by Philip Barry, and then repeated by Jimmy Stewart to Katherine Hepburn in the 1940 movie version of the same name.

defendants' representations and conduct surrounding the by-now-infamous sign-stealing scandal.

Specifically, the amended complaint alleges that plaintiffs Kristopher R. Olson, Christopher Lopez, Warren Barber, Christopher Clifford, and Erik Liptak, residents of Massachusetts, California, Texas, Florida, and Colorado, respectively, were participants in DraftKings daily fantasy baseball contests from April 2, 2017 to October 30, 2019. Amended Compl., ECF No. 20 ("AC") ¶¶ 121-141. Defendant MLB is an unincorporated association consisting of thirty Major League Baseball clubs, including the Astros and the Red Sox. Id. ¶ 22. MLB administers and operates the league through the Office of the Commissioner. Id. Defendant MLBAM is a limited liability partnership owned by the thirty major league clubs that has responsibility for internet and interactive marketing for MLB. Id. ¶ 23.

Plaintiffs' allegations against the defendants arise from plaintiffs' contracts with DraftKings. DraftKings is an online platform that operates fantasy sports contests on a daily and weekly basis across multiple sports. Id. ¶ 30. DraftKings's daily fantasy sports baseball ("MLB DFS") competitions require contestants to select a lineup of MLB players, each assigned a

different "salary" value set by DraftKings. Id. ¶ 31. The salary is based on the reported past performance statistics of the MLB player. Id. DraftKings participants accrue fantasy points based on the real-life performance of the players they have "drafted" on the particular day or week covered by the contest, and the participants' total points at the end of the contest determines who wins a cash prize. Id. ¶ 32. Participants pay DraftKings a fee for each fantasy contest, a portion of which is kept by DraftKings and the remainder of which funds the contests' prizes. Id. ¶ 33.

The complaint alleges that in 2013 and 2015, MLBAM acquired equity stakes in DraftKings "sizeable enough to reap meaningful benefit from the rise of daily fantasy." Id. ¶¶ 35-36. Further, DraftKings and MLB entered into a "comprehensive league partnership" that provided for co-branding of MLB DFS baseball contests, allowed DraftKings to offer market-specific in-ballpark experiences, and gave DraftKings promotional rights, use of MLB league and team logos, the exclusive right to sign sponsorship deals with individual MLB member clubs, and a designation as MLB's "Official Daily Fantasy Game." Id. ¶ 36. Shortly thereafter, DraftKings announced individual partnerships with

twenty-seven of MLB's member Clubs, including the Astros and the Red Sox. Id. ¶ 37.

During baseball games, pitchers and catchers use a series of "signs" to communicate the type of pitch being thrown, and the intended speed, movement, and location of the pitch. Id. ¶ 57. Keeping such signs secret from batters is critical to a pitcher's success because knowledge of which pitch is coming improves the batter's chances of hitting the ball. Id. While, nevertheless, sign-stealing is not prohibited per se, at all times here relevant MLB's rules and regulations prohibited using electronic devices to view or convey information about the opposing team's signs. Id. ¶ 54. All of MLB's member clubs have entered into an operating agreement pursuant to which the teams agree to be bound by the rules and regulations of MLB, including its electronic sign-stealing rules. Id. ¶ 44.

According to the complaint, during the 2017-2019 baseball seasons, officials and players of the Astros, the Red Sox, and likely other teams engaged in repeated instances of electronic sign stealing in violation of MLB's rules. Id. ¶¶ 70-114. MLB officially determined, and announced in a January 2020 press release by MLB Commissioner Robert Manfred, that the Astros engaged in such electronic sign stealing in the 2017 and 2018

seasons. Id. ¶¶ 88-92. Further, the MLB fined the Red Sox some unspecified amount in 2017 for an electronic sign stealing scheme. Id. ¶ 106. The complaint alleges that both teams significantly improved their batting performance during the class period when the sign stealing occurred. Id. ¶¶ 94-95, 107.

The thrust of plaintiffs' complaint is that defendants were aware of sign stealing by the Astros and Red Sox, but intentionally took no action to stop it in order to protect their financial interest and investment in DraftKings. Id. ¶¶ 198, 202. Furthermore, the complaint alleges that defendants made various false statements and omissions designed to conceal the fact of the sign stealing in order to deceive plaintiffs into believing that the MLB DFS competitions were a game of skill based on fair and legitimate player performance statistics. Id. ¶¶ 171, 205. Such deception was ultimately intended to induce plaintiffs and other DraftKings players to play MLB DFS, which they would not have done had they "known that the honesty of the player performance statistics on which [their] wagers were based and the results of [their] wagers were determined was compromised by MLB teams' and players' electronic sign stealing." Id. ¶¶ 124, 128, 132, 136, 140.

Based on this overarching theory of wrongdoing, plaintiffs -
- on behalf of themselves, a nationwide class, and Massachusetts,
California, Texas, Florida, and Colorado subclasses -- allege
common law fraud, negligence, and unjust enrichment claims
against all four defendants. They also allege violations of the
consumer protection statutes of all 50 states against the MLB
defendants, violations of the Texas Deceptive Trade Practices and
Consumer Protection Act ("TDTPA") against the Astros, and
violations of the Massachusetts Consumer Protection Act against
the Red Sox. All four defendants have now moved to dismiss the
Amended Complaint pursuant to Rule 12(b)(6).

To survive a motion to dismiss under Rule 12(b)(6), "a
complaint must contain sufficient factual matter, accepted as
true, to state a claim for relief that is plausible on its face."
Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). After discarding
allegations that amount to nothing more than legal conclusions,
see Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), the
court should "accept as true" what remains and "draw all
reasonable inferences in plaintiff's favor." Beazley Ins. Co.,
Inc. v. Ace American Ins. Co., 150 F. Supp. 3d 345, 354 (S.D.N.Y.
2015) (citing In re Elevator Antitrust Litig., 502 F.3d 47, 50
(2d Cir. 2007) (per curiam)).

Plaintiffs' claims sounding in fraud must further comply with Rule 9(b), which mandates that such claims "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "[I]n order to comply with Rule 9(b), 'the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 291 (2d Cir. 2006). Rule 9(b) also requires plaintiffs to "allege facts that give rise to a strong inference of fraudulent intent." Id.

## II. Analysis

### Common Law Fraud

To state a claim for common law fraud, plaintiffs must allege (1) a material misrepresentation or omission of fact; (2) that the defendant knew to be false; (3) that the defendant made with the intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) that caused injury to the plaintiff. See, e.g., Balles v. Babcock Power Inc., 70 N.E.3d 905, 913 (Mass. 2017); Bristol Bay Prods., LLC v. Lampack, 312 P.3d 1155, 1160 (Co. 2013); Small v. Fritz Cos., Inc., 65 P.3d 1255, 1258 (Cal. 2003); In re FirstMerit Bank, N.A., 52 S.W.3d 749, 758 (Tex. 2001); Johnson v. Davis, 480 So. 2d 625, 627 (Fla. 1985).

Plaintiffs here assert fraud claims based both on defendants'
affirmative misrepresentations, as well as defendants' omissions.

i. <u>Affirmative Misrepresentations</u>

The amended complaint primarily focuses on a series of
statements by MLB Commissioner Robert Manfred, and by players and
officials of the Astros and Red Sox, as well as by the two teams
themselves, that plaintiffs claim constitute affirmative
misrepresentations. These alleged misrepresentations may be
grouped into two categories: misrepresentations about fantasy
baseball and misrepresentations about major league baseball.

1. <u>Misrepresentations About Fantasy Baseball</u>

Plaintiffs first allege that the defendants, through public
statements by MLB Commissioner Manfred, repeatedly misrepresented
that the defendants were committed to "making sure that
appropriate safeguards were in place to insure that fantasy
baseball wagering competitions were fair." AC ¶ 168. But these
are the words of the complaint, not of Commisioner Manfred, and
plaintiffs fail to allege actual statements by Manfred that
plausibly support the existence of such a misrepresentation. On
the contrary, the actual statements by Manfred paricularized in
the complaint are directed to his commitment to preventing
gambling from impacting the integrity of live action baseball

games, id. ¶¶ 1-3, 40-41, 51-53, 65-67, and his concerns about whether fantasy organizations were properly self-regulating, id. ¶¶ 8, 39. None of these statements plausibly indicates defendants' commitment to safeguarding fantasy baseball from MLB rules violations.

In a belated attempt to cure this deficiency, plaintiffs, in their briefing and at oral argument, now emphasize that defendants allegedly misrepresented that fantasy baseball is a "game of skill" and promoted it as such. See, e.g., Pls Mem. in Opp. to MLB and MLBAM Mot. to Dismiss ("Pls. MLB Opp."), ECF No. 42 at 1. As support for this claim, plaintiffs cite a single news article in which Manfred stated "I'm quite convinced [fantasy baseball] is a game of skill, as defined by the federal statute." Id. Even drawing all inferences in plaintiffs' favor, this statement cannot support their claim that the defendants repeatedly "promoted and induced participation in [fantasy] contests as games of skill." Id. at 2. Taken in context, the statement simply addresses Manfred's lay opinion that fantasy baseball contests qualify as "games of skill" under existing federal law relating to gambling. See Hardiman Decl., Exh. 4, ECF No. 29. Plaintiffs have thus failed to allege that the defendants

made any misrepresentations about fantasy baseball contests themselves.

> 2. <u>Misrepresentations About Major League Baseball</u>

As for plaintiffs' allegations that defendants made misrepresentations about major league baseball, plaintiffs primarily allege that Manfred, on behalf of all defendants, falsely represented in "repeated public statements . . . that maintaining the integrity and honesty of the game of baseball was MLB's most important priority." AC ¶ 168.  However, although plaintiffs do quote statements by Manfred to this effect, <u>id.</u> ¶¶ 1-3, 40-41, 51-53, 65-67, they fail to plausibly allege that these statements were false.

As an initial matter, this assertion is contradicted by the complaint's own description of various investigations and public disclosures that the MLB did in fact undertake. <u>See</u> AC ¶¶ 38, 66, 87-92; <u>Hirsch v. Arthur Andersen & Co.</u>, 72 F.3d 1085, 1095 (2d Cir. 1995) (declining to credit "attenuated allegations . . . contradicted . . . by more specific allegations in the Complaint"). More importantly, even accepting as true plaintiffs' contention that defendants inadequately investigated player

misconduct, such a fact is not inconsistent with a "commitment" to integrity.

Plaintiffs also argue that various statements by Astros and Red Sox players and officials constituted misrepresentations. The vast majority of these cannot be properly characterized as false. They are largely speculations about the source of various players' or teams' success in a game, speculations not verifiable for their truth or falsity. Id. ¶¶ 96; 111. While plaintiffs attempt to recast these statements as affirmative representations "that the team's players' performance success was the result of player talent or other legitimate baseball factors," id. at ¶¶ 180, 472, and not cheating, the statements do not support such an inference.

Nonetheless, the complaint does ultimately allege a few particularized statements made by each defendant that are plausibly false. First, the plaintiffs plausibly allege that Astros President of Baseball Operations and General Manager, Jeff Luhnow, and Astros Field Manager A.J. Hinch made false statements when they denied that the Astros were involved in any sign stealing, even though, according to the complaint, both managers knew of the sign stealng at the time they made these statements. Id. ¶¶ 65-67, 89, 96(i). As the subsequent MLB report confirming

the Astros' involvement in sign-stealing effectively implies, these statements were plausibly  false. Id. ¶ 91.

Second, plaintiffs point to one plausibly false statement by MLB Commissioner Manfred. After receiving reports that the Astros had sent an individual to take pictures of an opponent's dugout for purposes of sign stealing, Manfred claimed to have performed a "thorough investigation" that found that the "Astros employee was monitoring the field to ensure the opposing club was not violating any rules." Id. ¶ 66. The plaintiffs urge that this investigation could not have been thorough because the Astros were cleared of wrongdoing that it later became clear they were guilty of. While a bit of a stretch, nonetheless, assuming the truth of plaintiffs' allegations and drawing all inferences in their favor, Manfred's statement that there was a "thorough investigation" could plausibly have been false.

Finally, the plaintiffs plausibly alleged that the Red Sox and Astros made a false statement when they represented that they would adhere to MLB's rules and regulations when they agreed to the Major League Baseball Constitution. *Id.* ¶ 366, 465. All of MLB's member Clubs have entered into an operating agreement, the Major League Constitution, pursuant to which all teams agree to be bound by all rules and regulations relating to games. *Id.* ¶

44. Again, it is rather a stretch, but the MLB's findings that the Red Sox and Astros did not adhere to these rules by using electronic sign stealing, see id. ¶¶ 88-92, 106, suggests that the representation of the Red Sox and Astros in signing the MLB Constitution were, even then, plausibly false.

      ii.      Rule 9(b) and Reliance

While plaintiffs have therefore plead, if barely, at least one plausibly false statement by each of the defendants, these misrepresentations cannot support plaintiffs' fraud claims because plaintiffs fail to adequately allege plaintiffs' reasonable reliance on these particular statements. This is true for two reasons.

First, plaintiffs fail to allege reliance with the particularity required by Rule 9(b). Although "the Second Circuit has not yet determined whether Rule 9(b)'s heightened pleading requirement applies to allegations of reliance in connection with a common law fraud claim," Ramiro Aviles v. S & P Glob., Inc., 380 F. Supp. 3d 221, 291 (S.D.N.Y. 2019), this Court agrees with the view that a plaintiff "must allege with particularity that it actually relied upon the [defendant's] supposed misstatements," id. (quoting In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig., 995 F. Supp. 2d 291, 312 (S.D.N.Y. 2014)). This

is because Rule 9(b) states unequivocally that "a party must state with particularity the cicumstances constituting fraud," and reliance has been an essential element of what constitutes fraud from the earliest days of the common law. Moreover, the fact that Rule 9(b) goes on to exempt from this requirement the state of the fraudster's mind (because not easily known to the defendant at the time of pleading),[2] this only reinforces the conclusion that what is known to the plaintiff, his own reliance, must be alleged with particularity. But here, the complaint does not even allege that the plaintiffs "saw, read, or otherwise noticed" any of the few actionable misrepresentations noted above, and thus completely fails to meet this standard. In re Fyre Festival Litig., 399 F. Supp. 3d 203, 217 (S.D.N.Y. 2019) (finding that such a failure does not meet even the general pleading requirements of Rule 8(a)).

Even setting aside Rule 9(b)'s heightened pleading requirements, the complaint's generalized allegations of reliance are more fundamentally flawed. Plaintiffs' theory of reliance, as outlined in their complaint and opposition briefing, comes down

---

[2] Moreover, even this exemption has been judicially interpreted to still require the plaintiff to plead enough particularized facts to raise a "strong inference of fraudulent intent" on the defendant's part. See, e.g., Campaniello Imports, Ltd. v. Saporiti Italia S.p.A., 117 F.3d 655, 663 (2d Cir. 1997) (citation omitted).

to the claim that they would not have entered DraftKings' MLB DFS contests but for defendants' supposed representations that fantasy baseball contests were games of skill, the integrity of which defendants would ensure by ensuring the integrity of major league baseball. See, e.g., AC ¶¶ 167-211; Pls. MLB Opp. at 4. But, as previously discussed, no such specific representations concerning fastasy baseball are actually set forth in the complaint. Absent such a misrepresentation, even plaintiffs' generalized theory of reliance must fall.

### iii.    Misrepresentation by Omission

Although the complaint primarily focuses on the plaintiffs' affirmative misrepresentation theory, in their briefing plaintiffs emphasize an alternative theory of fraud: misrepresentation by omission. Under this theory, plaintiffs argue that the defendants deceived plaintiffs by failing to disclose the existence of the sign-stealing schemes, and thus "that the statistics on which the MLB DFS contests were based were illegitimate and unreliable." Pls. MLB Opp. at 11. In general, a plaintiff asserting a fraudulent misrepresentation claim based on an omission must demonstrate a relationship between the plaintiff and defendant that gives rise to a duty to disclose. See, e.g., Adams v. Nissan N. Am., Inc., 395 F. Supp.

16

3d 838, 849 (S.D. Tex. 2018); Davis v. Dawson, Inc., 15 F. Supp.

2d 64, 137 (D. Mass. 1998); Hoffman v. 162 N. Wolfe LLC, 175 Cal.

Rptr. 3d 820, 826 (Ct. App. 2014). Plaintiffs fail to identify

any such duty owed them by any defendant, and thus their fraud by

omission theory also fails.

Trying to manufacture such a theory, plaintiffs rely on

Section 551 of the Second Restatement of Torts -- which some of

the states here relevant have judicially adopted -- to argue that

the defendants had a duty to earlier disclose the existence of

the cheating scandal, because its existence or non-existence was

"basic" to their decision to enter MLB DFS contests and because

disclosure was necessary to prevent the defendants' prior partial

or ambiguous statements of fact from being misleading. Pls. MLB

Opp. at 11-13. Section 551, in relevant part, reads as follows:

> One who fails to disclose to another a fact that
> he knows may justifiably induce the other to
> act or refrain from acting in a business
> transaction is subject to the same liability
> to the other as though he had represented the
> nonexistence of the matter that he has failed
> to disclose, if, but only if, he is under a
> duty to the other to exercise reasonable care
> to disclose the matter in question.

Section 551 is inapplicable here for several reasons, the

most obvious of which is that, on its face, it applies only

between "[o]ne party to a business transaction" and "the other."

The plain language of Section 551 thus appears to contemplate imposing a duty to disclose only in the context of a business transaction. See In re Rumsey Land Co., LLC, 944 F.3d 1259, 1273 (10th Cir. 2019) ("The disclosure duties described in § 551(2)(a)-(e) apply only to 'part[ies] to a business transaction.'"). Because plaintiffs have not alleged the existence of any transaction -- or any other comparable business relationship -- between themselves and the defendants, the Restatement does not support imposing a duty to disclose here.

Plaintiffs attempt to overcome this shortcoming, first, by arguing that DraftKings (the only entitiy with whch plaintiffs had any kind of transaction) had already joined with MLB in a joint venture that created some kind of legal identity between them. Pls. MLB Opp. 8-10. This joint venture theory, in addition to being essentially absent from the complaint, lacks merit. As the plaintiffs themselves acknowledge, the essential elements of a joint venture include "an agreement manifesting the intent of the parties to be associated as joint venturers" and "a provision for the sharing of profits and losses." Id. (quoting Alper Restaurant, Inc. v. Catamount Devel. Corp., 29 N.Y.S.3d 604, 606 (App. Div. 2016)). The complaint fails to allege the existence of

either essential element here, and so their joint venture theory fails.

Plaintiffs alternatively argue that the Restatement does not actually require a transaction between the parties at all to impose a duty to disclose. Although plaintiffs cite a few state cases that have imposed a duty to disclose on a defendant indirectly involved in a transaction, these cases all involved defendants with a much closer relationship to the transaction than that alleged here. In <u>Nota Constr. Corp. v. Keyes Assocs., Inc.</u>, 694 N.E.2d 401, 405 (Mass. App. Ct. 1998), for example, a court found that an architect had a duty to disclose information about a property to a subcontractor he was not in privity with because the architect "knew or should have known" that the subcontractor would rely on his plans. <u>Id.</u> at 405. In <u>Gutter v. Wunker</u>, 631 So. 2d 1117, 1118 (Fla. Dist. Ct. App. 1994), a Florida court found that attorneys who were paid to recruit investors for a business had a duty to disclose material facts about this business to the investors. In both of these cases, the defendants made misrepresentations specifically designed for the plaintiffs' use in deciding whether to enter a third-party transaction. These cases do not support imposing a duty to disclose here, where defendants made representations to the

public at large unrelated to the fantasy baseball transaction plaintiffs entered.[3]

Nor have plaintiffs identified any other reason to impose a duty to disclose on defendants. Plaintiffs argue that by advertising DraftKings competitions, the defendants assumed a duty of care to MLB DFS contestants that included a duty to "disclose to MLB DFS contestants any knowledge that such competitions were unfair." Pls. Mem. in Opposition to Defendant Boston Red Sox Baseball Club, L.P.'s Motion to Dismiss at 12, ECF No. 45. However, the cases plaintiffs point to for the proposition that advertising creates a duty of care are inapplicable in this context. Each of these cases involved a defendant advertising its own product[4] (in which case the defendants had preexisting duties independent of advertising), or

---

[3] Plaintiffs' citation to <u>Wells v. John Hancock Mut. Life Ins. Co.</u>, 85 Cal. App. 3d 66 (Ct. App. 1978) is even less persuasive. In that case, a California court found that a life insurance company had a duty to notify insured's creditor accepting the policy as security for a debt that the policy lapsed. It did so partially on the ground that the defendant "not entirely a disinterested third party" because insurers serve a "quasi-public" function. <u>Id.</u> at 71. Defendants serve no such quasi-public function here.

[4] <u>Stanley Indus. Inc. v. W.M. Barr & Co.</u>, 784 F. Supp. 1570, 1573-76 (S.D. Fla. 1992) (products liability case holding that manufacturer and retailer had duty to include warnings on product in Spanish instead of just English when the product was marketed in Hispanic media).

a defendant that otherwise made an express factual representation that gave rise to a duty.[5] In this case the defendants were not advertising their own product, but instead DraftKings' product (if even that). Moreover, plaintiffs fail to identify any specific advertisement or factual representation that could otherwise give rise to a duty.

Plaintiffs, in sum, have offered no basis for imposing a duty to disclose on any of the defendants. As such, they have failed to plead any actionable omission by the defendants that could give rise to a fraudulent misrepresentation claim. Because plaintiffs' affirmative misrepresentation claims also fail (for the reasons stated above), plaintiffs' common law fraud claims against all defendants must be dismissed.

Negligence

---

[5] <u>Disler v. Royal Caribbean Cruise Ltd.</u>, No. 17-23874-CIV, 2018 WL 1916614, at *4 (S.D. Fla. Apr. 23, 2018) ("Having advertised its onboard medical services, it must at the very least defend its refusal to provide them in this case."); <u>Allstate Ins. Co. v. Soulant Brothers</u>, LLC, 897 So.2d 693, 696-97 (La. Ct. App. 2004) (holding that a security company advertising it would provide surveillance cameras created a voluntarily assumed duty to provide cameras); <u>Cottam v. CVS Pharmacy</u>, 764 N.E.2d 814, 821-23 (Mass. 2002) (pharmacy assumed duty to warn customers of side effects when it advertised a promise to do so and voluntarily included a partial list); <u>Somerset Sav. Bank v. Chicago Title Ins. Co.</u>, 649 N.E.2d 1123, 1129 (Mass. 1995) (title insurance company advertising knowledge of local laws and practices could create a duty to notify customers of the applicability of a local law).

Plaintiffs' negligence claims fail for essentially the same reasons that their fraud claims fail. To state a claim for negligence, a plaintiff must allege: (1) a duty, (2) a breach of such a duty, (3) causation, and (4) damages. See, e.g., Coppola v. Smith, 935 F. Supp. 2d 993, 1013 (E.D. Cal. 2013); Coons v. A.F. Chapman Corp., 460 F. Supp. 2d 209, 218 (D. Mass. 2006); Janis v. Pratt & Whitney Can., Inc., 370 F. Supp. 2d 1226, 1229 (M.D. Fla. 2005); Williams v. Parker, 472 S.W.3d 467, 470 (Tex. App. 2015). As with their fraudulent misrepresentation claims, plaintiffs' negligent misrepresentation claims fail because plaintiffs have failed to allege the existence of any duty to disclose owed them by defendants or reliance on defendants' affirmative representations. Plaintiffs' remaining negligence claims fail because plaintiffs have not demonstrated that defendants owed them a duty to take more action to prevent player misconduct related to the sign-stealing scheme.

Plaintiffs' primary theory of negligence appears to be a theory of negligent misrepresentation that closely resembles their fraudulent misrepresentation claims. In brief, plaintiffs argue that defendants owed them a duty to disclose the existence of the sign-stealing scheme based on their previous statements and advertising practices. See, e.g., AC ¶¶ 345-52. As previously

noted, however, plaintiffs have failed to allege that the defendants owed them any duty to disclose that could support such a negligent omission theory. Insofar as plaintiffs' negligence claims are based on defendants' affirmative misrepresentations pursuant to Section 552 of the Second Restatement of Torts, their claims also fail. Although Section 552 allows for a negligent misrepresentation claim where a defendant "supplies false information for the guidance of others in their business transactions," this claim, like plaintiffs' fraud claims, requires plaintiffs to have "justifiabl[y] reli[ed]" on such false information. Restatement (Second) of Torts § 552. As indicated above, plaintiffs have demonstrated no such reliance on defendants' alleged misrepresentations here.

In addition to their negligent misrepresentation claims, plaintiffs assert that defendants negligently failed to take more action to prevent player misconduct related to the sign-stealing scheme. AC ¶ 350. Plaintiffs again, however, fail to explain how defendants owed plaintiffs any such duty of care absent any transaction or other relationship between them. As defendants note, three federal circuits have declined to hold that sports organizations owe similar duties even to their direct customers, ticketholders. See, e.g., In re Pacquiao-Mayweather Boxing Match

<u>Pay-Per-View Litig.</u>, 942 F.3d 1160, 1171-72 (9th Cir. 2019); <u>Mayer v. Belichick</u>, 605 F.3d 223, 230 (3d Cir. 2010); <u>Bowers v. Federation Internationale de l'Autombile</u>, 489 F.3d 316, 321 (7th Cir. 2007). While the Second Circuit has not ruled on this issue, these cases demonstrate at a minimum that finding a duty based on the much more attenuated relationship between fantasy baseball players and the defendants in this case is not supportable. Accordingly, plaintiffs' negligence claims against all defendants must be dismissed.

<u>Consumer Protection Laws</u>

Plaintiffs next allege that defendants' statements and actions violated the consumer protection laws of the states in which they reside, and "the substantially similar laws" of every other state. AC ¶ 147. Plaintiffs, however, fail to state a claim under their home-state consumer protection statutes: the Massachusetts Consumer Protection Law, M.G.L. c. 93A <u>et seq.</u> ("MCPL"); the Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code § 17.41 <u>et seq.</u> ("TDTPA"); the California Unfair Competition Law, Cal Bus. & Prof. Code § 17200 <u>et seq.</u> ("UCL"); the California Consumer Legal Remedies Act, Cal Civil. Code § 1750 <u>et seq.</u> ("CLRA"); the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 <u>et seq.</u> ("FDUTPA"), and the

Colorado Consumer Protection Act, Colo. Rev. Stats. § 6-1-101 <u>et seq.</u> ("CCPA"). Plaintiffs fail to do so both because they fail to satisfy the heightened pleading requirements of Rule 9(b) and because they fail to identify a sufficient nexus between the transaction that allegedly harmed them and the defendants to support a consumer protection claim.

As an initial matter, plaintiffs' consumer protection claims, like their fraud claims, are not pled with enough specificity to avoid dismissal here. Plaintiffs' consumer protection claims, which are based on the same alleged misrepresentations underlying their fraud claims, may only succeed upon a showing that the defendants' deceptive acts caused the plaintiffs harm.[6] Furthermore, because plaintiffs' consumer protection claims sound in fraud, they are subject to the heightened pleading requirements of Rule 9(b).[7] As previously

_____

[6] <u>Walsh v. TelTech Sys., Inc.</u>, 821 F.3d 155, 160 (1st Cir. 2016) (causation required to succeed under the MCPL); <u>Carriuolo v. Gen. Motors Co.</u>, 823 F.3d 977, 983 (11th Cir. 2016) (causation required under the FDUTPA); <u>In re Frazin</u>, 732 F.3d 313, 323 (5th Cir. 2013) (causation required under the TDTPA); <u>Dean Witter Reynolds Inc. v. Variable Annuity Life Ins. Co.</u>, 373 F.3d 1100, 1112 (10th Cir. 2004) (causation required under the CCPA); <u>Rojas-Lozano v. Google, Inc.</u>, 159 F. Supp. 3d 1101, 1112 (N.D. Cal. 2016) (reliance required under the CLRA); <u>Durell v. Sharp Healthcare</u>, 183 Cal. App. 4th 1350, 1362 (2010) (a claim based on a misrepresentation under the UCL requires actual reliance).

[7] <u>Davidson v. Kimberly-Clark Corp.</u>, 889 F.3d 956, 964 (9th Cir. 2018) (UCL and CLRA claims sounding in fraud are subject to Rule

noted in connection with plaintiffs' fraud claims, plaintiffs have failed to allege with any specificity that they even saw or heard plaintiffs' misrepresentations such that these misrepresentations could have caused them to enter MLB DFS contests they otherwise would not have entered. Rule 9(b) alone thus justifies dismissing plaintiffs' consumer protection claims.

The Court's concerns with plaintiffs' consumer protection claims, however, run deeper. The asserted connection between defendants and the allegedly harmful transaction plaintiffs entered into -- purchasing MLB DFS entry fees -- is simply too attenuated to support liability here. While plaintiffs are correct that the consumer statutes do not require privity to impose liability, the statutes nonetheless require plaintiffs to demonstrate some nexus between defendants and the transaction that allegedly caused the plaintiffs harm. Courts imposing liability based on these statutes in the absence of privity have thus required at least one, and usually multiple, nontrivial

---

9(b)); <u>Shaulis v. Nordstrom, Inc.</u>, 865 F.3d 1, 13 n.6 (1st Cir. 2017) (same for MCPL); <u>Strickland v. Bank of New York Mellon</u>, No. 4:19-CV-750-A, 2020 WL 42354, at *2 (N.D. Tex. Jan. 3, 2020) (same for TDTPA); <u>Llado-Carreno v. Guidant Corp.</u>, No. 09-20971-CIV, 2011 WL 705403, at *5 (S.D. Fla. Feb. 22, 2011) (same for FDUTPA); <u>HealthONE of Denver, Inc. v. UnitedHealth Grp. Inc.</u>, 805 F. Supp. 2d 1115, 1120-21 (D. Colo. 2011) (same for CCPA).

business relationships between the plaintiff and defendant,[8] or the defendant's production of the good or service that was the basis of the transaction,[9] or the defendant's misrepresentations about the good that was the basis of the transaction,[10] or the defendant's substantial participation in the transaction that caused the plaintiff harm.[11]

---

[8] See _Imprimis Inv'rs, LLC v. KPMG Peat Marwick LLP_, 69 Mass App. Ct. 218, 230 (2007) ("[A]bsence of privity of contract does not bar a claim under [Massachusetts] statute "so long as the parties [were] engaged in more than a minor or insignificant business relationship." (citation omitted)).

[9] _Chamberlan v. Ford Motor Co._, No. C 03-2628 CW, 2003 WL 25751413, at *8 (N.D. Cal. Aug. 6, 2003) (imposing liability under the CLRA based on the fact that the defendant was a manufacturer of the vehicles that consumers bought, even though these consumers did not buy the vehicles directly from the defendants); _Crowe v. Tull_, 126 P.3d 196, 201 (Colo. 2006) (holding that one of the elements of a claim under the CCPA is a finding that the unfair or deceptive practice "significantly impacts the public as actual or potential consumers of _the defendant's_ goods, services, or property" (emphasis added) (citation omitted)); _McAdams v. Monier, Inc._, 182 Cal. App. 4th 174, 105 Cal.Rptr.3d 704, 712-13 (Ct. App. 2010) (reversing denial of class certification in CLRA action against _manufacturer_ of allegedly defective roof tiles purchased from third-party distributor).

[10] _Makaeff v. Trump Univ., LLC_, 145 F. Supp. 3d 962, 980 (S.D. Cal. 2015) (finding a sufficient nexus to a transaction to impose CLRA liability based on the defendant's misrepresentations about the allegedly fraudulent product itself).

[11] See _Home Sav. Ass'n v. Guerra_, 733 S.W.2d 134, 136 (Tex. 1987) (liability allowed in the absence of privity under the TDTPA where the defendant was "so _inextricably intertwined_ in the transaction as to be equally responsible for the conduct of the sale" (citation omitted)); see also _Sproul v. Oakland Raiders_,

None of these connections is present here. In this case, plaintiffs do not allege that there was any business relationship between themselves and the defendants or that MLB DFS competitions were in any way a product of the defendants' creation. Nor do plaintiffs successfully allege that the defendants made any misrepresentations about the MLB DFS contests themselves, rather than about major league baseball. Finally, plaintiffs fail to demonstrate that the defendants were substantial participants in the transaction between plaintiffs and DraftKings. At most, plaintiffs allege that the defendants allowed DraftKings to use their marks and stadiums to advertise MLB DFS contests. AC ¶ 36-37. Plaintiffs, however, do not point to any cases suggesting that a defendant hosting or lending its marks to a party's advertisements alone transforms that defendant into a meaningful participant in any transaction that may result from such an advertisement. While hosting an advertisement combined with some other involvement might generate enough of a

_____

No. A104542, 2005 WL 1941388, at *19 (Cal. Ct. App. Aug. 15, 2005) ("The CLRA prohibits certain acts or practices 'undertaken by any person in a transaction.'" (citation omitted)); KC Leisure, Inc. v. Haber, 972 So. 2d 1069, 1074 (Fla. Dist. Ct. App. 2008) ("[I]t has long been the law in Florida that in order to proceed against an individual using a FDUTPA violation theory an aggrieved party must allege that the individual was a direct participant in the improper dealings.").

nexus in some states,[12] generalized allegations that the defendants promoted MLB DFS contests are not enough to link defendants to plaintiffs' transaction with DraftKings here. Plaintiffs' consumer protection claims must therefore be dismissed against all defendants.

<u>Unjust Enrichment</u>

Finally, plaintiffs assert unjust enrichment claims against the defendants. "To sustain a claim of unjust enrichment a plaintiff must show that the defendant has at the plaintiff's expense been enriched and unjustly so." <u>S.S. Silberblatt, Inc. v. E. Harlem Pilot Block--Bldg. 1 Hous. Dev. Fund Co.</u>, 608 F.2d 28, 37 (2d Cir. 1979); <u>see also</u> Restatement of Restitution, § 1 ("A person who has been unjustly enriched at the expense of another is required to make restitution to the other."). Plaintiffs' unjust enrichment claims fail because the plaintiffs have failed to plausibly allege that the defendants were enriched at plaintiffs' expense.

Plaintiffs offer three theories for how the defendants were enriched at plaintiffs' expense. First, they argue that the

---

[12] <u>See</u> <u>Galstaldi v. Sunvest Communities USA, LLC</u>, 637 F. Supp.2d 1045, 1056-57 (S.D. Fla. 2009) (upholding a FDUPTA claim despite a lack of privity because the defendants had directly participated in the sale of properties in question by conducting tours and selling the units in addition to promoting and advertising such properties).

defendants benefitted through a "share of DraftKings' enormous fantasy baseball fees." AC ¶ 119. Plaintiffs, however, fail to explain what these alleged fees were, how they came at plaintiffs' expense, or how they were purportedly shared between DraftKings and the defendants. Second, plaintiffs allege that the defendants were enriched by the "increase in the value of [MLB Defendants'] equity investment in DraftKings." Id. They fail to allege, however, how this "increase in value" can properly be characterized as coming at plaintiffs' expense. Finally, plaintiffs allege that defendants "benefited substantially from the increased fan involvement in the game that participation in fantasy baseball wagering engenders – producing increased fan attendance, increased advertising and television revenues, and increased sales of MLB paraphernalia." Id. Even if such attenuated assertions of benefit could support plaintiffs' unjust enrichment claims, plaintiffs fail to allege that they personally engaged in such increased baseball-related commerce such that defendants' benefit came at their expense. Plaintiffs unjust enrichment claims, like the rest of their claims, must therefore be dismissed.

## III. Conclusion

In short, the connection between the alleged harm plaintiffs suffered and defendants' conduct is simply too attenuated to support any of plaintiffs' claims for relief. While the verbose, rhetorical, and largely conclusory complaint does manage to plausibly allege a few misrepresentations by defendants, these statements, which are unrelated to fantasy baseball, do not plausibly support plaintiffs' claims of reliance. Moreover, plaintiffs provide no basis for imposing a duty to disclose on defendants absent a transaction or other relationship between themselves and the defendants. This absence of duty and reliance forecloses plaintiffs' fraud and negligence claims, and the lack of a transaction, relationship, or other nexus forecloses plaintiffs' consumer protection claims. Finally, plaintiffs' failure to demonstrate that defendants' enrichment came at their expense forecloses their unjust enrichment claims.

While a few of these deficiencies might conceivably be cured by giving plaintiffs another chance to amend their already amended complaint, most could not. Defendants' motions to dismiss are thus granted in their entirety, and plaintiffs' Amended Complaint is hereby dismissed with prejudce. Clerk to enter judgment.

SO ORDERED.

New York, NY
April 3, 2020

_____
United States District Judge